IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,964

STATE OF KANSAS,
*Appellee*,

v.

KYLE TREVOR FLACK,
*Appellant*.

SYLLABUS BY THE COURT

1.

When the facts material to a decision on a motion to suppress evidence are not in dispute, the inquiry on appeal becomes a question of law.

2.

Whether a defendant's repeated statements during a custodial interview to "[t]ake me to jail" constitute an unambiguous invocation of the right to remain silent depends on their context.

3.

The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases are a relevant guidepost for evaluating an ineffective assistance of counsel claim in a capital case, but they are not coextensive with constitutional requirements.

4.

Appellate courts review continuance denials for abuse of discretion. A court abuses its discretion when its action is unreasonable or based on an error of law or fact. The party asserting an abuse of discretion must demonstrate it.

5.

Appellate courts traditionally accord deference to a trial court's ruling on a juror challenge for cause.

6.

The State may allege the crime of capital murder was committed in a "heinous, atrocious, or cruel" manner with respect to any single victim of a capital murder conviction when the conviction is predicated on the killing of more than one person. There is nothing in the statute suggesting that each individual killing must be shown to have been committed in a heinous manner.

Appeal from Franklin District Court; ERIC W. GODDERZ, judge. Oral argument held January 31, 2022. Opinion filed January 19, 2024. Affirmed.

*Clayton J. Perkins*, of Capital Appellate Defender Office, argued the cause, and *Meryl Carver-Allmond*, of the same office, and *Debra J. Wilson* and *Reid T. Nelson*, of Capital Appeals and Conflicts Office, were with him on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Natalie Chalmers*, assistant solicitor general, argued the cause, and *Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with them on the briefs for appellee.

*Alice Craig*, of Lawrence, was on the brief for amici curiae Midwest Innocence Project, joined by Witness to Innocence and Floyd Bledsoe.

2

PER CURIAM:  A jury convicted Kyle Flack of capital murder, first-degree murder, second-degree murder, and criminal possession of a firearm. In a separate proceeding, it sentenced him to death after finding two aggravating factors that were not outweighed by mitigating circumstances. On direct appeal, Flack raises numerous issues. We affirm his convictions and the sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2013, Andrew Stout and two friends, including Steven White, lived at Stout's house in rural Franklin County. Flack, another friend of Stout's, occasionally spent time there. Flack brought a shotgun with him everywhere, usually keeping it in a black duffel bag, and even slept with it nearby. Stout was dating K.B. and intended for the friends to move out by May 1, so she and her 18-month-old daughter, L.B., could move in.

After not hearing from Stout, on May 6, some concerned friends went to his home to look for him. While checking an outbuilding near the house, they discovered a body under a tarp, later identified as White. They called 911. Investigators found two more bodies in the house, later identified as Stout and K.B. The investigators suspected Flack, who they located in Emporia at a friend's apartment. Officers arrested him shortly after midnight on May 8, and read him his *Miranda* rights. They searched the Emporia apartment, finding a black duffel bag. It contained a shotgun cleaning kit, a roll of duct tape, and zip ties.

Flack provided his versions of events to detectives twice after his arrest. His story evolved during those interviews. The first started around 3:30 a.m. on May 8 in Emporia. By that time, officers had identified White's body in the outbuilding but not the two in the master bedroom. They considered L.B., the child, to be missing.

3

*First interview*

In what the State depicts as Flack's first of eight versions of events, he claimed to last see Stout, K.B., and L.B. on April 27 at Stout's house. He said Stout and K.B. planned to go bowling after Flack and Stout bought cigarettes. Flack claimed they separated in Pomona, where his friend, Kenneth Douglas, picked him up and drove him to Emporia.

As details emerged, so did inconsistencies. Flack said he and Stout went to Ottawa before Pomona. Stout dropped him off at the Pomona Dollar General, and Flack then went to a nearby cemetery with two women, who later took him to Ottawa. From there, his stepbrother picked him up, and he slept on the stepbrother's couch that night. He did nothing the next day, April 28, other than walk around Pomona.

Then, Flack said he went to Emporia on April 29. But before going, his stepfather dropped him off at Stout's house, where he played video games for a half hour. At that time, some people stopped by looking for Stout. The stepfather returned and took him to the Pomona Dollar General, where Douglas picked him up to go to Emporia. Flack said he stayed with Douglas while there, and he bought a new cellphone after Douglas' kids broke his old one. He later changed that story, saying he broke the phone himself. He acknowledged speaking to Stout's mother by both phone and text during this time.

Without prompting, Flack mentioned his shotgun, claiming Stout kept Flack's 1300 Remington in his bedroom closet. He also mentioned buying "PDX Defender" shotgun shells from Wal-Mart a few months earlier.

Flack also claimed Stout sold marijuana, and every resident at Stout's house used drugs. When describing White, he said White brought "tweakers" (methamphetamine

4

users) to Stout's and that made Stout nervous. The last time Flack saw him, White "was fuckin' out of his mind, like been up too long, like you could see his eyes all fucking black and sunk in." Flack got along with White, but he would not call him his "best friend."

Flack's second version began after Detective Tammy Alexander confronted him with other witness statements. She told Flack that Douglas denied his kids broke the phone and said he picked up Flack in Emporia, not Pomona. Alexander told Flack the victims were shot with a shotgun, and that "Defender" shotgun shells were at the scene; she noted K.B.'s car was found in Emporia, where Flack had been.

Flack eventually said he was in Emporia to sell drugs. He sold "dope" (methamphetamine) to a group of Mexicans known as the South Side Lobos. He also claimed to work for "Omar," a bald-headed Mexican with a 13 tattooed on his chest, whom he had met in prison. Omar, in turn, introduced Stout to "Chewie," so Chewie could supply Stout with marijuana for dealing. Omar drove him to Emporia, and from there Douglas picked him up. Flack appeared to be explaining why he lied about the place where he met Douglas and attempting to align his story with Douglas'.

Flack then mentioned going to Stout's on April 29 or 30. Finding the door locked and no one home, he walked to the outbuilding, where he noticed something unnatural because the dog's bowl was outside and windows left open. In the outbuilding, he saw a foot hanging out from a tarp. Not knowing what to do, he left the residence.

The conversation returned to Omar, Chewie, and Flack's Emporia business. He described delivering drugs for Omar right after being dropped off in Emporia. He said Omar gave him a car, telling him he could use it if needed. Seeing the car's license plate, Flack told Alexander that in "[t]hat moment I knew it was my ass," because he realized it

5

was K.B.'s car. Even though he did not think it could be proven and did not know why Omar would want to kill Stout, he said, "I guess they did it, but I don't know."

During questioning, Alexander showed Flack a mugshot and asked if he knew the person. His answer was unclear. Alexander later testified the photo was of a long-deceased person named Omar who had been arrested in Emporia but had never been in the Hutchison prison while Flack was there. At the end of the Emporia interview, Alexander asked what happened to L.B. Flack told her "they . . . took the kid," and "the dude could be a child molester." Officers then transported Flack to Ottawa, where he rested and ate.

*Second interview*

The next day in Ottawa, Flack's interview began his third version. In this iteration, he claimed Omar and Chewie killed Stout and K.B. while Flack was at the house. He did not see L.B. that day. The murders happened a day or two before the people stopped by Stout's and found Flack at the house alone.

On the day of the murders, Flack went to Stout's with Omar and Chewie, who went in, while he stayed outside. Upon hearing a gunshot, he became frightened and fled. Flack saw Omar and Chewie carry duffel bags from the house. Flack contacted his stepfather for transportation. Flack spent time in Ottawa and Pomona before going back to Stout's, getting K.B.'s car, and driving it to Emporia.

Later in the interview, Flack's fourth version emerged, placing himself inside the house during the murders. According to this account, Omar, Chewie, and Flack were at Stout's because Stout owed Omar money. All three went into the house, and, once inside, Omar and Chewie entered Stout's bedroom with Stout and shut the door. Flack heard two

6

gunshots and ran out. Outside, he heard additional gunfire. Seeking cover under the front porch, he witnessed Omar leaving with drugs and a shotgun. After Omar and Chewie left, Flack discovered Stout's lifeless body in the bedroom under a pile of clothes. He then took K.B.'s keys from her purse, walked to the outbuilding, and noticed another body under a tarp. He took K.B.'s car to Ottawa, called Douglas to plan to visit Emporia, and drove K.B.'s car to Emporia a day or two later.

Up to this point, Flack had not described White's death. That changed with his fifth version, in which he claimed a "skinny Mexican" killed White. Based on this version, the day White died, he met with Omar, Chewie, and the Mexican in Ottawa and they all drove to Stout's. Omar and the Mexican went inside where Stout, K.B., and White were. Flack and Chewie stayed outside. When Omar and the other man came back outside, everything seemed fine. Flack thought they would leave, but Omar asked about guns. Flack brought his shotgun outside, and the group took turns shooting it. White came out and joined in.

After White fired the gun, he handed it to the Mexican. While the others chatted, White and the Mexican went to the outbuilding. Flack heard a gunshot. The Mexican came out and went into the house with Chewie. Three more gunshots were fired. The two men came back out with a duffel bag, keys, and a wallet. They then drove back to Ottawa, leaving Flack with K.B.'s car. Omar told him to get rid of the car.

In his sixth version, Flack told detectives he and Stout shot White in mid-April. He claimed Stout and White argued one day about White living there rent-free. Later that evening, Stout told Flack he did not know what to do about White. Flack told him, "[J]ust shoot him." Stout replied, "[I]f I do that[,] I'll have to bury him." Flack told Detective Jeremi Thompson, "[T]hat's when the joking stopped." The next day, Flack and Stout

7

discussed the situation again. Responding to Stout's worry, Flack told him to "just do whatever you need to do" and that he had Stout's "back."

Not long after that, Stout asked White if he had gotten a job yet, which led to more bickering. White went outside. Stout grabbed Flack's shotgun, and he and Flack followed White. Stout shot White, who was in front of a car in the outbuilding. Stout gave Flack the shotgun. Flack shot White again, which killed him. After hiding the body under a tarp, the two went inside the house and pondered next steps while smoking marijuana.

Flack's seventh version addressed Stout's murder. Flack said after White's murder, he got paranoid. He called Omar to see if Omar could help him leave the area. Omar agreed but insisted on Stout returning the fronted drugs and money first. As a result, Omar and Chewie came to Stout's to settle up. Once there, Omar and Stout began arguing. Eventually, Omar shot Stout twice in the back. Flack claimed Omar shot Stout two more times and then beat him with the shotgun. During the shooting, K.B. laid on the bed with her hands tied behind her back.

Either Omar or Chewie—Flack could not remember who—thought Flack looked stressed by what had happened, so they gave him money to buy marijuana. When he came back, Flack found Stout dead under the clothing pile. He told the detectives Omar gave him the shotgun and said to get rid of it. He said he broke it down and threw it into a dumpster in Emporia.

In his eighth version, Flack described what happened to K.B. and L.B. When Omar killed Stout, K.B. tried to run out of the room. Chewie told Flack to grab her, so he did. Flack found zip ties in his bag, and Chewie gave him a bandana to silence K.B. Meanwhile, L.B. entered the room. Chewie took K.B. to the living room, where he raped her.

Afterward, Chewie brought K.B. back to the bedroom and forced her to lie face down on the floor. He shot K.B. with the shotgun. Chewie rolled her over next to Stout. He and Omar started throwing clothes on the bodies. Then L.B. walked toward her mother. Chewie shot L.B. in the back and put her into a small suitcase he found in the bedroom. Omar and Chewie took the suitcase, drugs, and money to the car and left. They told Flack it was "his problem" to get rid of K.B.'s car and the shotgun. Sitting on the porch, he called his brother to figure out whether to call the police or run. He drove to Emporia and stayed with Douglas for a few days.

The interview ended when Flack requested an attorney.

*Post-interview investigation*

Investigators followed up on Flack's claims he met "Omar" in prison. They reviewed lists of inmates overlapping his time in prison, producing a few leads, but none were "Omar." They also reviewed his phone records, identifying most calls and who was on the other end. No calls were connected to "Omar" or "Chewie."

Emporia's city recycling center found a shotgun receiver and magazine in the trash and notified police. Forensic testing showed they were from the same gun that fired the shotgun shells discovered at Stout's.

On May 11, an Osage County sheriff's deputy found debris on a creek bank that led to locating L.B.'s body, which was contained in a partially submerged black suitcase.

Cell tower data for Flack's phone established that from May 1 until the morning of May 3, his phone did not move from the general area of Stout's house. Around 10:40

9

a.m., May 3, there was a single call attributed to his phone that registered on two towers, showing Flack was about a mile-and-a-half from where police found L.B.'s body. Later on May 3, the phone began using towers around Emporia. While there, Flack bought a new phone, and the data showed him moving around Emporia on May 6 and May 7.

In mid-August, Flack's mother met him in jail, and the visit was recorded. Flack told his mother, "I'm gonna end up gettin' a lotta time outta this" and "I'm not guilty of all of it but I'm guilty." Flack also revealed he lied to police: "[D]own the line they're gonna ask me questions like . . . who else was involved . . . . And unfortunately . . . they didn't believe my fuckin' story. I tried tellin' 'em . . . some bullshit but they didn't—uh, they already had so much evidence I guess."

*Criminal proceedings*

The State charged Flack with the capital murder of K.B. and L.B. in the same course of conduct, first-degree murder of Stout, first-degree murder of White, criminal possession of a firearm, and misdemeanor sexual battery of K.B. At arraignment, the State filed notice of its intent to seek the death penalty based on five aggravators: (1) Flack was previously convicted of attempted second-degree murder; (2) he knowingly or purposefully killed more than one person; (3) he committed the crime to avoid or prevent lawful arrest or prosecution; (4) he killed K.B. in an especially heinous, atrocious, or cruel manner; and (5) he killed K.B. as a potential witness against him.

During the trial's guilt phase, the State's evidence included what is outlined above. Its theory was that the murders occurred in large part as Flack described, but it was he, rather than "Omar" or "Chewie," who performed the acts. Flack did not testify. The jury found him guilty on all counts except misdemeanor sexual battery. The court accepted the

10

verdicts, and the State moved for a separate sentencing proceeding for the jury to determine whether to impose a death sentence.

During the penalty phase, the State relied on its guilt-phase evidence, as well as additional evidence. To show K.B. suffered additional mental anguish from being unable to see, as she was not wearing her glasses at the time of her murder, the State presented testimony—showing K.B. always needed glasses to see—and surveillance footage of K.B. wearing glasses on the presumed date of her death. The State also introduced evidence demonstrating Flack's previous conviction for attempted second-degree murder, along with the journal entry for his previous conviction.

In mitigation, Flack again did not testify, instead presenting several witnesses, including an expert on how prisoners might acclimate to prison life; a prison work supervisor whom Flack successfully worked with in prison; Flack's parole officer, who knew of no violations he committed since being paroled; and a supervisor at Ottawa Sanitation, who described Flack as a good employee. He also presented evidence showing Flack's horrific childhood of neglect and abuse. His friends and family testified how their lives would be affected if Flack were to receive a death sentence.

Other witnesses—many of whom were experts in mental illness and its treatment—testified about Flack's mental health struggles, including depression, anxiety, and hallucinations. His diagnoses include major depressive disorder, schizoaffective disorder, anxiety disorder, and antisocial personality disorder. His mental health struggles plagued him in various ways, even to the date of trial, and would likely continue, though less so in a structured prison environment.

The jury found the second and fourth aggravating factors existed:  Flack knowingly or purposefully murdered K.B. and L.B, and he killed K.B. in an especially

11

heinous, atrocious, or cruel manner. It unanimously sentenced him to death. The judge found "that the aggravating factors totally outweighed any mitigating factors that were provided and the evidence supports the imposition of the death penalty in this particular case." See K.S.A. 2012 Supp. 21-6617(f). The court imposed the death penalty.

Flack directly appeals to this court. Jurisdiction is proper. K.S.A. 2022 Supp. 21-6619(a) (permitting a death sentence to automatic review by and appeal to Supreme Court).

SUPPRESSION OF FLACK'S POLICE INTERVIEWS

Before both the preliminary hearing and trial, the State sought to admit Flack's custodial statements to police. The defense argued against admission, claiming he invoked his right to *counsel*. The court overruled his objections. Flack now argues he invoked his right to *silence* through his repeated requests to be taken to jail, requiring suppression of anything that followed.

*Additional facts*

When the State moved to admit Flack's custodial statements for the preliminary hearing, it submitted testimony from the detectives who interviewed Flack. The court found the statements voluntary. It also found his alleged requests for counsel were equivocal and did not require the detectives to end the interview. It underscored the point by noting Flack knew what he had to do to end the Ottawa interview by plainly stating he wanted to talk to his attorney. This, the court held, was a clear communication the detectives "honored."

12

At trial, a newly assigned judge took up the renewed motion to admit the custodial statements for trial purposes. The State presented its witnesses again. Detective Alexander testified she advised Flack of his *Miranda* rights at the first interview in Emporia and had him sign a *Miranda* form. The transcript reflects his agreement to speak to the officers:

"[Alexander]: . . . Before you're asked any questions you must be advised and understand your rights. *Number one, you have the right to remain silent.* Number two, anything you say may be used against you in a court of law. Number three, you have the right to talk to a lawyer and have him with you while you've being questioned. Number four, if you cannot afford to hire a lawyer, one will be appointed to represent you before questioning if you wish. *Number five, you can decide at any time to exercise these rights and . . . not answer any questions or make any statements. . . .*

"[Flack]: I have read or had read to me a statement of the rights listed above. I understand what the rights are and I am willing to answer questions before talking to a lawyer. I do not want a lawyer present during questioning. I understand and know what I am doing. No promises nor threats of any kind have been made to me and no pressure or coercion of any kind has been used against me and this statement has been made by me voluntarily.

"[Alexander]: If you agree to that, I'll have you sign it. All right, Kyle, you said . . . that you were pissed off. You wanna talk to me about that?

"[Flack]: Yeah.

"[Alexander]: What are you pissed off about?

"[Flack]: 'Cause I wanna know what happened to my friend.'" (Emphases added.)

Alexander testified she did not perceive any of his statements during the Emporia interview as invoking his rights. She agreed that a suspect saying, "[T]ake me to jail[.] I'm done, I'm tired of you asking the same questions," was different from asking for a lawyer.

Detective Thompson testified he did not perceive Flack's statement—"'Should I get a lawyer honestly?'"—as a request for an attorney. Instead, he took it as asking Thompson's "opinion on what he should do." Thompson told Flack he "could not give him legal advice." And when Flack told Thompson, "I can't tell you no more, so either do whatever you do or I need an attorney or something because I can't tell you what I don't fucking know," the detective took it as an "ultimatum" when Flack became frustrated with questioning. He testified that was a consistent pattern throughout questioning: "[A]nytime we began asking questions in regard to [L.B.], he became upset. Visibly his face would turn red. He would clinch his fists, a couple times he hit the table."

Thompson noted the Ottawa interview ended when Flack said he could not talk to the detective anymore and wanted his attorney. This remark, Thompson viewed, was different because Flack's earlier mentions of an attorney were followed up by him quickly saying he wanted to help and wanted to talk to the detectives.

The court admitted the custodial statements over the defense objection, finding them voluntary. It also determined Flack's statements, "'[s]hould I get a lawyer honestly?'" and "either do whatever you do or I need an attorney . . . because I can't tell you what I don't know," were equivocal and did not invoke the right to counsel.

*Preservation*

Flack now frames his remarks—i.e., demanding to be taken to jail—as an invocation of his right to remain silent rather than the right to counsel. Generally, "[a] party may not object to the introduction of testimony on one ground at trial and assert another ground on appeal." *State v. Green*, 315 Kan. 178, 183, 505 P.3d 377 (2022). But in death penalty cases, K.S.A. 2022 Supp. 21-6619(b) mandates that "we consider any errors the parties raise on appeal, whether preserved for review or not." *State v. Cheever*, 295 Kan. 229, 241, 284 P.3d 1007 (2012), *vacated and remanded on other grounds* 571 U.S. 87, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

*Standard of review*

We are at a bit of a disadvantage in this appeal. Had Flack argued the right-to-remain-silent issue before the district court, we would apply a bifurcated standard of review. See *State v. Aguirre*, 301 Kan. 950, 954-55, 349 P.3d 1245 (2015) (district court's factual finding reviewed for substantial competent evidence and its legal conclusion de novo). But he did not, and the district court's factual findings about voluntariness and invocation of his right to counsel minimally assist our appellate review. Regardless, the record includes the interviews' video clips and transcripts, so we can proceed. See *State v. Kleypas*, 272 Kan. 894, Syl. ¶ 5, 40 P.3d 139 (2001) (*Kleypas I*) ("When the facts material to a decision of the court on a motion to suppress evidence are not in dispute, the question of whether to suppress becomes a question of law. An appellate court's scope of review on questions of law is unlimited."), *overruled in part on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd on other grounds by* 548 U.S. 163, 169-73, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); see also *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018) (When the material facts supporting a district court's decision

15

on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress is a question of law over which an appellate court has unlimited review.).

*Discussion*

An accused's right to remain silent during a custodial police interview arises under both the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. *Aguirre*, 301 Kan. at 954. A suspect's invocation of the "'right to remain silent must be scrupulously honored and cuts off further interrogation.'" 301 Kan. at 954. But law enforcement officers' duty to "scrupulously honor" a suspect's decision to invoke their right requires the suspect's clear communication without any ambiguity or equivocation. 301 Kan. at 957. Such an invocation requires context, as "an invocation that is ambiguous by itself may be unambiguous when considered in conjunction with the statements or events preceding it." *United States v. Cordier*, 224 F. Supp. 3d 835, 840 (D.S.D. 2016) (relying on *Smith v. Illinois*, 469 U.S. 91, 105 S. Ct. 490, 83 L. Ed. 2d 488 [1984]).

Another difficulty arises because Flack does not rely on any single statement as *the* invocation of his right. Instead, he argues various statements to take him to jail aggregated unambiguously to invoke his right to remain silent. He says his "intention to end the questioning was equally clear as he became progressively more insistent that the questioning stop and that he be taken to jail." But "it is not his intent that matters; it is whether his statement would have been unambiguous to a reasonable officer." *Lopez v. Janda*, 742 Fed. Appx. 211, 214 (9th Cir. 2018) (unpublished opinion). In other words, the issue is whether his communication was unambiguous to a reasonable officer, not just him. See *Aguirre*, 301 Kan. at 957 (a reasonable officer's understanding matters).

16

Going back to the record, Flack made his remarks over about 45 minutes, with most falling during an 18-minute span, when he grew increasingly agitated as detectives were hesitant to believe him and countered his story with other evidence. He grew particularly angry when they pressed him about the child's location, despite him denying he knew anything. We address each comment below with its relevant context.

His first remark expresses his frustration at the detectives' refusal to believe him.

"[Alexander]: . . . We have your dad who's sayin' something totally different than what you did.

"[Flack]: . . . What did he supposedly say that's different than me?

. . . .

"[Alexander]: That all the times you're sayin' you were with him is not the case.

"[Flack]: All right, whatever, *so apparently we're at a stalemate so do I put these back on and you take me somewhere or what's the deal?*" (Emphasis added.)

This plainly fails to invoke a right to remain silent. Flack merely acknowledges his version differed from his father's, and the detectives were free to not believe him. His second comment was no different.

"I didn't do it at all. Think I'd kill my fuckin' friends? Kidnapping some fuckin' baby, *take me to jail*. . . . Put these motherfuckers on me, take me where you need to do . . . . But I didn't kill my fuckin' friends. I didn't kill them fuckin' people and I didn't fuckin' take no baby." (Emphasis added.)

17

Like the first statement, Flack simply told Alexander she could believe he killed the victims, claiming his innocence. His requests to be taken to jail after an impasse in questioning were too ambiguous to invoke the right to silence. See, e.g., *State v. Speed*, 265 Kan. 26, 37, 961 P.2d 13 (1998) ("'And since we're not getting anywhere I just ask you guys to go ahead and get this over with and go ahead and lock me up and let me go and deal with Sedgwick County, I'm ready to go to Sedgwick County, let's go.'"); *Bullitt v. Commonwealth*, 595 S.W.3d 106, 116-17 (Ky. 2019) (holding the defendant's statement—"[I]f I'm going to jail, I'm saying, let's go, you know, that's all I'm saying, sir. I'm innocent, I'm innocent."—did not invoke the right to silence).

His next three comments followed that same pattern, and all convey he lacked an answer for the detective.

> "[Alexander]:  Where would we go to find [L.B.]?
>
> "[Flack]:  How the fuck should I know?
>
> "[Alexander]:  'Cause you're the only one that does.
>
> "[Flack]:  You know what? [Third comment] *Put these on.*
>
> "[Alexander]:  You're the only—
>
> "[Flack]:  Hey—no—
>
> "[Alexander]:  —one that knows.
>
> "[Flack]:  —I ain't. I keep fuckin' tellin' you I don't know where the fuckin' baby is.

18

. . . .

"[Alexander]: Who do we talk to?

. . . .

"[Flack]: How the—I do not know. . . . I only speak one fuckin' language here. I don't know where that baby is. I don't know what happened at that fuckin' house. But apparently you guys got it all sewed up. So do whatever we're doin'. Because I can keep tellin' ya the same fuckin' thing and you're gonna keep fuckin' the same thing. . . .

"[Alexander]: Where was she left?

"[Flack]: I don't fuckin' know. [Forth comment] *Goddamn, quit—*

. . . .

"[Alexander]: . . . Who the fuck do we talk to, Kyle?

"[Flack]: I don't fuckin' know. You know what? [Fifth comment] *Wrap these up, take me to fuckin' jail because obviously you're just gonna keep fuckin' goin' so I can't give ya information I don't fuckin' have so do what you do.*" (Emphases added.)

Flack got heated and made these comments as Alexander asked about the child's whereabouts. The third remark was a dramatic gesture, not a substantive cutting off of questioning. The fourth was so brief; it was inscrutable. And the fifth appears to be another "take me to jail" statement, "*because* . . . I can't give ya information *I don't fuckin' have so* do what you do.*" (Emphases added.) Flack was communicating if the officers keep asking questions he could not answer, they should just charge him. But, taken together or separately, he does not unambiguously invoke his right to remain silent.

19

A few minutes later, the detectives encountered strong resistance when asking Flack why he was in Emporia. In this context, Flack made his sixth alleged invocation: "You wanna . . . fuckin' take me to jail, charge me, whatever, I—we done sat here and fuckin' talked about it, okay? It's that simple." But again, he did not clearly state to stop the interview. Instead, he expressed frustration the officers were unwilling to trust him.

The final four remarks occurred when Alexander asked for detail about his Emporia business involving "some Mexicans."

"[Alexander]:  Who were you selling dope to?

"[Flack]:  Some Mexicans.

"[Alexander]:  What are their names?

"[Flack]:  I don't know their fuckin' names.

"[Alexander]:  Where do they live?

"[Flack]:  I don't know where they live. I meet 'em on the fuckin' south side, at fuckin' at Saint Pablo Park.

"[Alexander]:  Okay what do they drive?

"[Flack]:  [Seventh comment] *Take me to jail.*

"[Alexander]:  What do they drive?

"[Flack]:  Drive—[Eighth comment] *take me to jail man. . . .*

"[Alexander]:  What are their phone numbers?

20

"[Flack]: [Ninth comment] *Take me to jail.*

"[Alexander]: Kyle, this is your opportunity to help yourself.

"[Flack]: How am I helpin' myself? You made your mind up.

"[Detective Bob Moews]: No we haven't. That's why we're tryin' to ask you about these people.

"[Flack]: *What do you want me to tell you?* A bunch of fuckin' Mexicans. They're called SSLs, South Side Lobos. . . .

"[Alexander]: What do you sell them?

"[Flack]: Meth. . . .

"[Alexander]: How much was this time?

"[Flack]: Two pounds.

. . . .

"[Alexander]: Who do you deliver for?

"[Flack]: [Tenth comment] *Take me to jail*. . . .

"[Alexander]: Okay, Kyle let's help yourself, okay?

"[Flack]: There is no help myself. . . .

. . . .

21

"[Alexander]: All right, then let's—help out, okay?

"[Flack]: *I don't know the fuckin' people.* . . . [T]hey just contact me, tell me to pick it up." (Emphases added.)

Flack's comments here—"What do you want me to tell you?"—and his statement—"I don't know the fuckin' people"—lead to a reasonable inference Flack meant "I don't know," rather than invoking his right to remain silent. As the State correctly argues, his claimed invocations were "amenable to a variety of interpretations" or "an expression of frustration and anger," "a recognition of his difficult predicament," "a hyperbolic effort to bolster his own credibility and convince the detectives that he was telling the truth," and "a negotiating tactic . . . intended to shape the investigator's interrogation more favorably to him." In context, these comments show Flack believed the questioning about what happened at Stout's house was irrelevant, rather than exercising a constitutional right. He simply claimed the detectives had already made up their minds about his involvement in these deaths, including their belief he could help them find the child.

Under the circumstances, Flack's "take me to jail" comments lead to multiple interpretations—rendering his communication unclear. Flack had experience with police interviews; read the *Miranda* form, which stated with particularity "you have the right to remain silent," and "you can decide at any time to exercise these rights and . . . not answer any questions or make any statements"; affirmatively stated he understood his rights; and told the detectives he would answer their questions.

We hold Flack did not invoke his right to remain silent by repeatedly suggesting he be taken to jail. Isolated or combined, his statements did not unambiguously and unequivocally assert his right to silence. See *People v. Davis*, 46 Cal. 4th 539, 587-88, 94

22

Cal. Rptr. 3d 322, 208 P.3d 78 (2009) (holding defendant's statement—"'Well then book me and let's get a lawyer and let's go for it, you know'"—was a challenge to interrogators that defendant employed as interrogation technique, not a means to invoke right to counsel or silence; contrasting these comments with statements later in interrogation, "'get me a lawyer'" and "'it's over and [he was] done'" answering questions, that constituted a valid invocation); *Ridley v. State*, 290 Ga. 798, 801-02, 725 S.E.2d 223 (2012) (holding "take me on to jail" did not unequivocally invoke the right to silence); *State v. Waloke*, 835 N.W.2d 105, 112 (S.D. 2013) (rejecting the defendant invoked her right to silence by stating, "officers should just take her to jail" as she did not explicitly say she wanted to remain silent or did not want to speak with police anymore); *State v. Cummings*, 357 Wis. 2d 1, 24, 850 N.W.2d 915 (2014) (holding "'take me to my cell. Why waste your time?'" in context not unequivocal invocation); *Kirk v. Carroll*, 243 F. Supp. 2d 125, 132 (D. Del. 2003) (denying habeas relief, reasoning Delaware state court conclusions that, "'Just take me away, please. Take me away,'" and "'Just take me the fuck away,'" were not clear invocations of right to silence was not contrary to clearly established federal law); *Bird v. Brigano*, 295 Fed. Appx. 36, 38 (6th Cir. 2008) (unpublished opinion) (analyzing two exchanges during interview, first Bird said "'there's no sense me sitting here trying to say what happened with me . . . because as usual, when it comes to Derrick Bird, he's guilty'" and then stood up and said, "'You take me in; get booked, man,'" and second in response to detective explaining this is your chance to talk Bird said, "'Everything's right there in the paper. I'm done talking about it'"; holding neither were unequivocal invocations of right to remain silent when viewed in context).

The district court properly admitted his custodial statements.

Throughout Flack's case, defense counsel expressed concern they would not be prepared for trial. That concern became especially acute after his original counsel withdrew in 2015. In response, the court continued the proceedings until the following spring. Despite that, the defense requested another continuance and repeated such requests through the pretrial proceedings.

Now, on appeal, Flack asserts the district court's scheduling orders violated his Sixth Amendment due process right to present a defense, his corresponding rights under sections 5 and 10 of the Kansas Constitution Bill of Rights, and finally his statutory rights under K.S.A. 22-3406 (reasonable time to prepare for trial) and K.S.A. 22-3401 (continuances for good cause). From this, we discern two lines for analysis. First, he statutorily argues the district court abused its discretion by denying persistent continuance requests. Second, he constitutionally asserts a due process denial under the federal and state Constitutions. We reject these claims.

*Additional facts*

Flack's court-appointed defense team changed during pretrial when his initial lead attorney withdrew in July 2015 and had to be replaced. Flack moved to continue the trial, claiming the defense will not be prepared for a September trial and asked to postpone until next year. The court granted the motion and continued the trial to February 22, 2016.

In November 2015, defense counsel filed a second motion to continue trial. Counsel argued the team's difficulty replacing the original attorney created a deficiency that could compromise Flack's right to counsel. The team further noted it lacked

sufficient time to review discovery and the complete investigation based on ABA Guidelines. See American Bar Association, *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 920 (2003). The team indicated it was still developing its mitigation case. It had identified family members central to Flack's "social history" but had not yet interviewed them; some were out of state, while others were unwilling to meet with defense counsel. It had hired experts in childhood development, forensic psychiatry, and prison adjustment, but the interviews were pending. And it was still collecting school, medical, and psychiatric records. Finally, the team said its heavy caseloads were already hard to manage and would be compounded by the holidays.

The court heard the motion in late November ex parte and in camera. It acknowledged the team's difficulties but pointed out the case had been pending for about two years. Expressing frustration with the apparent lack of progress, it denied the request without the State's input as it was skeptical more time would materially aid the defense.

In January 2016, the defense renewed its motion, which was again heard by the court ex parte, in camera. Defense counsel reiterated the same concerns but highlighted the need for a neuropsychologist to examine Flack and testify during the penalty phase. The court denied the motion and pushed the defense to retain an expert. It asked the defense to file a new continuance motion "to clarify a little more succinctly the particular issues that prohibit you in proceeding." It said it would revisit the issue the next week.

When voir dire began the following week, the defense filed its third continuance motion. The court heard the motion in camera after that day's questioning. Defense counsel reiterated their concerns and noted the defense team had lost its administrative support. The court systematically worked through the concerns, focusing especially on the efforts to retain experts. It said, "[C]ertain issues . . . should have been taken care of

25

quite [some time] ago." It perceived the defense's concerns as mainly being mitigation preparation and asked the defense to push forward over the two weeks remaining before the scheduled opening statements. It also advised the defense to continue preparing its mitigation case during the guilt phase.

Toward the end of the week, the court returned to the continuance motion. By that time, the defense had retained a neuropsychologist to begin work within a few weeks and would take about a week to finish. The parties discussed a plan to push back the guilt phase to accommodate the expert and proposed the court complete voir dire and conduct jury selection by February 17. The guilt phase would be pushed back to March 7, and the penalty phase to March 28. The court agreed, and the trial proceeded on that schedule. But when the trial began, defense counsel asked for further postponement, saying only "[w]e believe we've litigated this issue thoroughly." The court denied the request.

*Statutory challenge—a reasonable time to prepare for trial*

We review continuance denials for abuse of discretion. A court abuses its discretion when its action is unreasonable or based on an error of law or fact. The party asserting an abuse of discretion must demonstrate it. *State v. Hillard*, 315 Kan. 732, 760, 511 P.3d 883 (2022). Here, Flack does not claim the district court erred based on an error of law or fact; our focus is whether the district court erred by acting unreasonably.

K.S.A. 22-3401 requires all persons charged with a crime to be tried without unnecessary delay and, at the same time, allows a district court to continue proceedings when good cause is shown. In addition, K.S.A. 22-3406 entitles a defendant to "a reasonable time to prepare for trial." Flack alleges he was denied a reasonable time to prepare his case.

The ABA Guidelines thoroughly outline recommendations for defense counsel's duties in all aspects of death penalty cases. Flack relies almost exclusively on the guidelines and argues those obligations made his case especially time consuming, justifying his requested continuances. Generally, capital cases have "extraordinary complexity and demands" compared to noncapital cases. *ABA Guidelines*, 31 Hofstra L. Rev. at 921. For example, capital cases increase defense counsel's obligations to investigate mitigators. See generally 31 Hofstra L. Rev. at 924-28. In addition, counsel should "at all stages of the case . . . make every appropriate effort to establish a relationship of trust with the client, and should maintain close contact with the client." ABA Guideline 10.5. Counsel also must "conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guideline 10.7(A). And counsel must consider and assert all potential legal claims at both the guilt and penalty phases and each claim's costs and benefits. ABA Guideline 10.8.

The ABA Guidelines are a relevant guidepost for evaluating an ineffective assistance of counsel claim in a capital case, but they are not "coextensive with constitutional requirements." *State v. Cheatham*, 296 Kan. 417, 433, 292 P.3d 318 (2013). The guidelines and their comments are useful to gauge what is "a reasonable time to prepare for trial" under K.S.A. 22-3406, and how a district court should exercise discretion when deciding whether to grant a continuance. The concern is not whether counsel satisfied the guidelines, but rather whether, in considering various circumstances presented in a particular case, including the guidelines, the district court gave the defense reasonable time to prepare for trial. Granted, the guidelines can contextualize the problems facing capital defense counsel, but caselaw ultimately governs whether a continuance denial rises to an abuse of discretion.

In *State v. Robinson*, 303 Kan. 11, 363 P.3d 875 (2015), *disapproved of on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017), for example, we found

no abuse of discretion in a district court's denial of continuances in a capital murder case after comparing it to other similar cases. See 303 Kan. at 92-93 (listing cases). There, we acknowledged retained counsel's withdrawal "certainly increased appointed counsel's workload and responsibility" but noted "they were not starting from scratch." 303 Kan. at 92. At the time of the withdrawal, counsel had been working for seven months. And the district judge granted Robinson a continuance, giving newly appointed counsel another seven months to prepare. "Appointed counsel also had the benefit of the preparation [prior counsel] had done over the course of nearly 2 years." 303 Kan. at 92. The *Robinson* court held "the district judge properly exercised his lawful discretion by refusing requests for a second continuance to prepare the guilt phase defense," reasoning a reasonable fact-finder could have agreed with that ruling. 303 Kan. at 93; see also *State v. Green*, 315 Kan. 178, 179-80, 505 P.3d 377 (2022) ("A court abuses its discretion if its action . . . 'is . . . unreasonable, i.e., if no reasonable person would have taken the view adopted by the trial court.'").

In Flack's case, almost two years and 10 months elapsed between his initial counsel entering an appearance and trial. Nearly two years passed between his second counsel entering an appearance and trial, and almost a full year passed between his third counsel entering her appearance and trial. Initial and second counsel worked together for about one year and three months, and the remaining counsel worked together for about 250 days before trial after initial counsel retired in July 2015.

The first continuance request relied on the ABA Guidelines and focused on initial counsel's withdrawal, remaining counsel's other caseload and inexperience in capital cases, the volume of discovery to review, and the need to retain expert witnesses. The court granted the continuance, mostly based on the original counsel's withdrawal.

28

Flack requested a second continuance so counsel could provide Flack "with the high-quality legal representation contemplated under prevailing Constitutional and professional standards." The motion again cited the ABA Guidelines and highlighted defense counsel's independent duty to investigate. The defense noted it had recently received "20,000 pages and 500 discs" of discovery and "more than 100 scientific reports" from the State. They were also waiting on their own experts' reports. The court deferred ruling and asked the defense to push forward and keep it apprised of problems as they arose.

The third continuance remained much the same as the second. The defense filed it at the court's request during voir dire to reflect the previously raised issues' status. The defense was still reviewing and synthesizing discovery and conducting its investigation. But the most pressing issue was securing a neuropsychologist, which the defense did on February 4. The court, with the State's agreement, pushed the trial's start date from February 22 to March 7 to allow the expert to evaluate Flack.

We discern no abuse of discretion in denying the second and third continuance requests. As in *Robinson*, Flack's initial counsel was a single member of a three-counsel team. He left second counsel with over a year on the case and a third counsel who joined the team a few months earlier. Similarly, original counsel's withdrawal did not require the team to start from scratch. Recognizing second counsel could not just pick up where original counsel left off, the court granted a continuance of several months. As to the second request, the court pushed the defense to make progress and pointedly questioned what aspects were challenging. Over the next months, the outstanding tasks narrowed, even as the defense continued to press for postponement. The largest obstacle, needing a neuropsychologist, became clear as trial approached, and the court granted a short continuance.

29

Throughout this process, the record reflects the court seriously considered the defense's concerns and worked to address them as they arose. It reasonably handled the case and did not abuse its discretion.

*Constitutional challenge—right to present a defense*

Flack argues the denial of his second and third continuance requests violated his right to present a defense under the Sixth Amendment to the United States Constitution and under sections 5 and 10 of the Kansas Constitution Bill of Rights. We reject these arguments.

The Sixth Amendment states:  "[T]he accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." Section 5 declares:  "The right of trial by jury shall be inviolate." And section 10 "allow[s]" the accused to

> "appear and defend in person, or by counsel; to demand the nature and cause of the accusation against him; to meet the witness face to face, and to have compulsory process to compel the attendance of the witnesses in his behalf, and a speedy public trial by an impartial jury . . . . No person shall be a witness against himself, or be twice put in jeopardy for the same offense."

The phrase "right to present a defense" is a blanket term for a collection of a defendant's rights, including a right to present evidence on his or her own behalf. See *State v. Carr*, 300 Kan. 1, 207-08, 331 P.3d 544 (2014) (*R. Carr I*) (discussing nature of "right to present a defense," focusing on rules for excluding evidence and right to present theory of defense), *rev'd and remanded on other grounds* 577 U.S. 108, 136 S. Ct. 633,

30

193 L. Ed. 2d 535 (2016); *United States v. Markey*, 393 F.3d 1132, 1135 (10th Cir. 2004) (a defendant's "right to present a defense" refers to the collective rights "to testify, present witnesses in his own defense, and to cross-examine witnesses against him" rooted in the Fifth and Sixth Amendments). In some contexts, a continuance denial may implicate rights under the umbrella of "right to present a defense." See *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983) ("[A]rbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel.").

The United States Supreme Court provides a "continuance is traditionally within the discretion of the trial judge." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964). When a request is reasonable, a continuance denial may "myopic[ally] insist[] upon expeditiousness . . . render[ing] the right to defend with counsel an empty formality." 376 U.S. at 589. The Court conceded, "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate [the accused's constitutional rights]," but it noted, "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." 376 U.S. at 589.

We review a continuance denial's possible interference with the right to present a defense de novo. See *Robinson*, 303 Kan. at 85. Like the *Ungar* Court found the answer in the circumstances, we examine various factors present in a particular case. In *State v. Anthony*, 257 Kan. 1003, 898 P.2d 1109 (1995), a defendant contended the trial court denied him his right to retain chosen counsel by failing to grant a continuance so that his retained counsel could prepare for his case. When rejecting his constitutional claim, the *Anthony* court considered several factors, including whether other continuances have been granted; whether legitimate reasons were shown to postpone trial; and whether denial of the continuance would prejudice the defendant. The *Anthony* court held the trial

31

court did not abuse its discretion in denying a continuance in which the sole reason for the continuance was to permit new counsel to enter his appearance. 257 Kan. at 1019. Here, the trial began some eight months after his original counsel withdrew, and Flack proceeded with the same appointed counsel team he had all along. Moreover, the district court gave counsel reasonable time to prepare a capital case given the defense team's relative continuity and the total time available.

We hold the district court's handling of continuance requests did not violate Flack's Sixth Amendment right to present a defense or his rights under sections 5 and 10 of the Kansas Constitution Bill of Rights.

### DENIAL OF FOR-CAUSE CHALLENGES TO SITTING JURORS

Throughout voir dire, the district court denied several defense for-cause challenges to selected jury members. These challenges questioned prospective jurors' predisposition to the death penalty. Some challenged members joined the 20 jurors and alternates who heard the case, and some of those joined the 12 who convicted Flack and sentenced him to death. On appeal, Flack argues the district court committed reversible error by denying his challenges. Again, we disagree.

*Additional facts*

When voir dire began, the court separated prospective jurors into six panels. It questioned two panels per day over nine days to reduce the initial group from which the parties could exercise peremptory challenges. Each party received 20 peremptory challenges to produce a final jury of 20, including eight alternates.

32

During peremptory challenges, defense counsel asked for "extra strikes" because the court denied so many of the defense's for-cause challenges. The court ruled this was premature since the defense had not yet exhausted all of its peremptory strikes. After exercising its seventeenth peremptory challenge, the defense renewed its request for more strikes. The State opposed this for two reasons. First, the defense still had some peremptory strikes. Second, procedurally it was unclear where the new strikes would come from because alternate jurors were necessary. The court denied the request, reasoning the defense had already struck the only juror who was arguably "automatic death." The defense then formally objected to the 20 selected jurors' composition. The court randomly selected alternate jurors but did not disclose to the jury who it selected until deliberations.

When trial began, the court released three jurors after each raised an issue, bringing the jury down to 17. Before deliberations, the court named the alternates, and the 12 primary jurors deliberated and ultimately entered guilty verdicts.

Prior to the penalty phase, the court conducted a second voir dire at the defense's pretrial request to determine whether any jurors, including the alternates, had reached an opinion on a death sentence. The jurors were questioned individually, outside the presence of the others. The court asked five questions and then allowed follow-up questions by the State and defense.

Juror J.B.'s responses during questioning raised concerns when he expressed reluctance to change his mind about imposing the death penalty. While claiming he would follow the law and consider all mitigating circumstances, his skepticism persisted. After questioning the other jurors, the defense asked to remove two potential jurors, including J.B. Given J.B.'s role as part of the 12-member jury that convicted Flack, the court removed J.B. But it retained the other juror as being an alternate.

33

On appeal, Flack lists 18 potential jurors denied a for-cause challenge. But Flack used peremptory challenges to remove 16 of those 18.

*Standard of review*

We review for-cause juror challenges for an abuse of discretion because the trial judge is better positioned to make the ruling. *Robinson*, 303 Kan. at 154. "Appellate courts have traditionally accorded a great deal of deference to a trial court's ruling on a juror challenge for cause." *State v. Miller*, 308 Kan. 1119, 1138, 427 P.3d 907 (2018).

*Discussion*

K.S.A. 22-3410(1) permits a party to "challenge any prospective juror for cause." Among the nine grounds listed in K.S.A. 22-3410(2) is: "(i) His state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he can act impartially and without prejudice to the substantial rights of any party." In death penalty cases, prospective jurors may be excluded when their views on the death penalty "would 'prevent or substantially impair the performance of his duties as a juror.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). This applies whether the challenge is directed at death-leaning or life-leaning jurors. *R. Carr I*, 300 Kan. 1, Syl. ¶ 20. The pertinent question for our appellate review is not whether we agree with the district judge's ruling but, instead, whether the record fairly supports its ruling. *Robinson*, 303 Kan. at 155.

Of the 18 jurors Flack discusses, only M.F. and J.H. ended up as jurors. And as the State correctly notes, the relevant question is whether the seated jurors prejudiced Flack. See *Miller*, 308 Kan. at 1138 (failing to excuse a juror for cause requires conviction

reversal only when the defendant demonstrates he or she was prejudiced as a result). Even if a defendant was compelled to use peremptory challenges "to correct erroneous for-cause rulings," it is a nonissue absent the defendant showing the sitting jury was prejudiced. 308 Kan. at 1139. Flack, as the party asserting the error, bears the burden of establishing the denial of a for-cause challenge constituted an abuse of discretion and resulted in prejudice. 308 Kan. at 1138.

*Juror M.F.*

During the State's initial voir dire, the prosecutor asked M.F. about her general views on the death penalty. In the past, M.F. strongly supported the death penalty without much knowledge. But after working for a judge who opposed it, she reevaluated her stance. She said the judge told her that "many people are in prison that later they're found not guilty." She then noted, "I need to be open to hearing all of the information and understanding the whole story before I can say strongly one way or the other."

During defense questioning, M.F. said she would consider factors such as the degree of the childhood abuse or the mental illness, as well as a person's adaptability to prison, as potential mitigating circumstances. But she "need[ed] more information to make a decision." Counsel further asked about her shifting death penalty views. She reiterated, "I don't feel strongly one way or the other about the death penalty. But it definitely is going to have to be very clear [that the defendant is guilty.]"

In her questionnaire, M.F. suggested childhood experience "plays a huge role" but should not affect capital sentencing. She believed individuals must take responsibility for their choices and must not blame others. M.F. noted she would consider factors "more serious than [abuse or unloved]" necessary to warrant capital punishment.

35

The defense challenged M.F. for cause, focusing on her questionnaire response suggesting the death penalty was appropriate in a multiple victim case "if there's absolutely no question about [the] person's guilt." She "equivocate[d]" in her written responses about her beliefs and opinions on the death penalty, which defense counsel claimed made it "hard to draw out any information what her thoughts are." The defense characterized her responses as "it depends." Counsel argued M.F. conveyed believing people must take personal responsibility for their actions created a "mitigation impairment with her." Ultimately, "there's a doubt that she could be impartial."

The court rejected this, reasoning M.F. appeared to be more favorable to the defense than some jurors the defense previously challenged. M.F. affirmed she had not formed an opinion on Flack's guilt from media or pretrial sources. The court emphasized her evolving beliefs about the death penalty and her "conscientious" approach, expressing faith in her ability to be fair, impartial, and law-abiding at sentencing.

In his brief, Flack argues M.F. dismissed the importance of extreme childhood experiences and said mercy would play no role in her penalty decision. He contends her stance, even after agreeing to follow the law, is "devastating" to a fair penalty trial, as her "willingness to follow the law does not prevent long held *biases* from affecting a verdict."

But contrary to Flack's contention, during voir dire, M.F. consistently expressed she could not definitively answer how various factors would weigh in her decision-making process without knowing more. She clarified her questionnaire response, explaining that while she would not be swayed by typical childhood traumas, she would consider more serious circumstances. The record shows M.F. was open to mitigation evidence, and her reservation about childhood experiences pertains more to their abstract persuasiveness rather than a complete rejection.

36

Finally, Flack seemingly argues a juror is biased if he or she is unwilling to rely on the nebulous concept of mercy alone for mitigation. But he cites no support for this. As Justice Scalia once noted, "what one juror might consider mitigating another might not. And of course the ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy—the quality of which, as we know, is not strained." *Kansas v. Carr*, 577 U.S. 108, 119, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). So even if M.F. said "mercy"—a concept she equated with "pity" during voir dire—should not be considered on her questionnaire, she remained willing to consider the various circumstances in Flack's case before reaching a decision.

Rather than showing a preformed bias favoring the death penalty, M.F.'s voir dire responses consistently reflected a willingness to wait and see the evidence before deciding, which is exactly what a juror should do. The court scrutinized her qualifications and outlined its reasons why she was a qualified juror. As it pointed out, given her hesitation about the death penalty, if anything, M.F. was a favorable defense juror. It was neither error nor an abuse of discretion for the court to deny this challenge.

*Juror J.H.*

During voir dire, J.H. reiterated a neutral view on the death penalty, expressing a commitment to base his decision on the case's facts and the court's instructions. He acknowledged "there's no rehabilitation" for some people but noted sometimes "people get into situations" and there are "so many hypothetical situations out there." J.H. recognized the weighty responsibility of imposing the death penalty, underscoring the need for certainty in such decisions.

37

On his questionnaire, J.H. indicated a belief that mercy should not play a role in sentencing. And when asked whether he believed in an "eye for an eye," his answer was, "Let the punishment fit the crime." During voir dire, when questioned about his "eye for an eye" response, he explained he could envision "a hypothetical situation" in which a crime is "so horrific" that he could support the death penalty. But he acknowledged the death penalty is not suitable for every murder case, although it is "there for a reason" and there are situations in which it can be used. J.H. admitted that until he learned the juror's role during this process, he had not deeply considered his stance on the death penalty.

Following the conclusion of J.H.'s panel, defense counsel challenged him for cause based on his questionnaire responses. Counsel interpreted J.H.'s "eye for an eye" response as potentially shifting the burden to the defense to "prove . . . that life without the possibility of parole was deserved." The court rejected this challenge, finding J.H.'s responses indicated he has not yet made up his mind one way or the other and characterizing him as "middle of the road" on the death penalty. The court found no reason to doubt his fairness and impartiality during the guilt phase, and that he conveyed a willingness to consider the mitigating circumstances if the case reached the penalty phase.

On appeal, Flack claims the district court abused its discretion by denying his for-cause challenge to J.H., because of his questionnaire responses: "Let the punishment fit the crime," and mercy should not be a factor in his decision-making. Flack continues that J.H. "harbor[ed] an unacceptable bias on a matter crucial for a fair proceeding," even if he agreed to follow the law.

Nevertheless, like M.F., the record establishes J.H. would listen to the evidence and decide the case on the facts and law. And we hold the district court did not abuse its discretion in denying these challenges.

38

*Jurors not challenged for cause*

Besides M.F. and J.H., Flack argues three other seated jurors were similarly biased: J.S., C.C., and G.B. He asserts both J.S. and C.C. expressed their belief that childhood experiences and mercy were irrelevant considerations for determining punishment, citing only their questionnaire responses. For J.S. and C.C., Flack adds that although each agreed to consider childhood experiences during voir dire, the prosecution led them to agree only to "consider" mitigators, without committing to "meaningful consideration," potentially prejudicing the defense.

As for J.S., the defense questioning was cursory. When asked about his thoughts on the death penalty, he replied he could impose it in some cases depending on the evidence. Similarly, when asked about his starting position for or against the death penalty, he stated he did not have an opinion until he considered the evidence. Defense counsel asked each juror if they could "consider mercy for that guilty murder"; J.S. simply replied, "Yes." Counsel did not follow up. In fact, his response to most questions was a simple yes or no. And he said he would follow and apply the law. When asked about mitigating factors, he answered he would consider the evidence whether "the person really . . . [was] aware of what he was doing."

The State asked C.C. to elaborate on her questionnaire responses about the effect of childhood experiences. She elucidated upbringing may not always determine the outcome, but "a loving, caring home" increases the likelihood of the individuals "turning out to be better people." Despite this, she acknowledged she had written that "people are responsible for their actions." The State followed by asking whether she could consider childhood experiences as mitigating factors, C.C. replied people "have to be accountable

39

for [their actions]" but she "would consider aggravating and mitigating" factors and "weigh them up" in her decision-making process.

When questioned by defense counsel, C.C. acknowledged she placed greater importance on the circumstances of killing in the context of aggravating and mitigating considerations. She confirmed "the background of a person" would not matter to her. But she clarified a commitment to fairness and honesty in weighing these factors. After further questioning, C.C. agreed she would give the defense's mitigators weight, consider them, and "truly give [them] meaningful consideration."

As for G.B., Flack contends he "expressed strong biases in favor of the death penalty, writing that he definitely favored the death penalty, if the murder of a mother and child were proven beyond a reasonable doubt." G.B. did not think childhood experiences were relevant to capital punishment, as there was "'no excuse for capital murder.'" Flack claims the "upshot" of G.B.'s agreement to "consider" childhood experiences after saying they were not "relevant" on his questionnaire was "that he would consider them but not give them relevance."

On his questionnaire, G.B. acknowledged the role of upbringing in adult behavior but maintained it did not excuse capital murder. The State asked whether his position changed after he understood the process for imposing the death penalty; G.B. said he would consider any mitigating circumstances he was instructed to consider. Defense counsel gave G.B. a hypothetical of a conviction with various aggravators. Counsel asked how jurors should view the death penalty before factoring in any mitigators. G.B. answered, "You have to look at the mitigators to get it on the scale and the aggravators would have to outweigh the mitigators." Counsel characterized his questionnaire response about the likelihood of imposing the death penalty for the premeditated capital murder of a woman and child as "almost automatic." But G.B. clarified that was not what he had

40

meant, "[i]t depends on all the evidence presented." G.B. also noted that after he learned "how the system works," he could consider childhood experiences as a mitigating circumstance.

The State, of course, did not have a chance to rehabilitate the jurors because Flack did not challenge them during the trial. Likewise, the court could not make a record for appellate review on each juror's ability to be fair and impartial. Thus, Flack's failure burdens our analysis.

Flack's cursory argument about these jurors' prejudices focuses on their limited responses and matter-of-course agreement to apply the law as instructed. But the record establishes trial counsel never probed deeper into the concerns appellate counsel now raises. Nothing shows these jurors were improperly prejudiced or biased against Flack. The district court conducted voir dire carefully and cautiously, addressing the defense's concerns seriously. The follow-up voir dire questioning either clarified or rehabilitated each juror's positions, so the court could reasonably conclude these jurors would be fair and impartial. We find no error.

GUILT PHASE PROSECUTORIAL ERROR

Flack asserts three instances of guilt-phase prosecutorial error that, individually and collectively, warrant conviction reversal. First, he claims the State's repeated use of the expression "level[ing] the scales" during voir dire to describe the jury's role at sentencing negated the presumption of life in Kansas. Second, he argues the State's mention of Mother's Day during opening statements to describe the discovery of L.B.'s body was inflammatory and meant to provoke juror sympathy. Third, he claims a baseball analogy during the State's closing rebuttal argument gave an incorrect reasonable doubt definition. We disagree.

41

*Standard of review*

We review prosecutorial error claims in two steps: error and prejudice. First, we determine whether the alleged acts "'fall outside the wide latitude afforded prosecutors to conduct the State's case.'" *State v. Blansett*, 309 Kan. 401, 412, 435 P.3d 1136 (2019). Second, if we find error, we then "'determine whether the error prejudiced the defendant's due process rights to a fair trial.'" 309 Kan. at 412. In the second step, we apply the constitutional harmlessness standard laid out in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), which demands the State show beyond a reasonable doubt that the prosecutorial error did not affect the trial's outcome in light of the entire record. In other words, the question is whether there is no reasonable possibility that the error contributed to the verdict. *Blansett*, 309 Kan. at 412.

*Leveling the scales*

Before each voir dire panel, the State consistently described the transition from the guilt phase to the penalty phase by using the colloquialism "level[ing] the scales." In one panel, for example, the prosecutor told jurors they would once again hear the evidence and follow the judge's instructions. And based on the evidence and the law, the jury would determine whether the sentence should be life without the possibility of parole or the death penalty. The prosecutor illustrated the "concept of the process" as: "You have a scale, you level the scale. . . . Then you consider the circumstances."

These included the statutory aggravating circumstances the State had to prove beyond a reasonable doubt on one side and the mitigating circumstances, which need not be proved beyond a reasonable doubt, on the other. The prosecutor told the panel, "The weighing of circumstance is an individual determination" "based upon your own life

42

experiences, and your values." The prosecutor concluded if "[t]he aggravators outweigh the mitigators, imposition of the death penalty. If the mitigators outweigh the aggravators, life without the possibility of parole. If they're equal, imposition of the death penalty." The prosecutor used a similar description with each panel.

In Kansas, our statutory scheme for imposing the death penalty requires a sentencing jury to find beyond a reasonable doubt at least one statutory aggravating circumstance and, "further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist." K.S.A. 2022 Supp. 21-6617(e). Under this scheme, if the aggravating circumstances and mitigating circumstances are in "equipoise," as we have termed it, the sentence is death. *Kansas v. Marsh*, 548 U.S. 163, 179, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

In *Marsh*, the defendant argued the equipoise provision "establishes an unconstitutional presumption in favor of death." 548 U.S. at 166-67. But the Court rejected that argument and held it was constitutionally permissible for an equipoise weighing to result in a death sentence. In reaching that conclusion, the Court stated our "sentencing system is dominated by the presumption that life imprisonment is the appropriate sentence for a capital conviction" because it requires a life sentence if the State fails to meet its burden to prove an aggravating circumstance. 548 U.S. at 178. Flack argues the presumption of life the Court found "dominated" our system means the "jury does not start with level scales." He asserts that because "'level scales' is a more colloquial term for equipoise," the prosecutor's language "with every jury panel, and thus with every seated juror," "primed the jury to start from equipoise rather than the proper presumption of life."

We agree with Flack's premise that our capital sentencing scheme includes a presumption of life. But we do not agree with his conclusion that the prosecutor's

43

"level[ing] the scales" phrasing contradicted that presumption or misstated the law. The "default" sentence after a capital conviction is a life sentence without the possibility of parole. And that default continues until the State proves, and the jury finds, an aggravating circumstance beyond a reasonable doubt. It is only at that point the weighing process or "scales" come into play. The prosecutor's analogy did not misinform the jury and imply a presumption of death. Rather, it conveyed just the opposite: that the guilty verdict itself carried no weight in sentencing deliberations.

We hold the prosecutor's description of the deliberative process accurately explained the State's burden to prove an aggravating circumstance and the weighing process that follows. The prosecutor's comments were not error.

*Prosecutor's reference to Mother's Day*

The State's opening statement made a single reference to Mother's Day before describing law enforcement's discovery of L.B.'s body: "In just a few hours it will be Mother's Day. It's May 11th, 2013. And at this point in the evening the sun has set, darkness has fallen, and there's a group of officers and they're huddled together on a bridge." Flack argues the fact it was almost Mother's Day was immaterial and meant to inflame the jurors' sympathies. We disagree.

Prosecutors have wide latitude when crafting opening and closing statements, so long as their statements "'accurately reflect the evidence, accurately state the law, and cannot be "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law."'" *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021). When deciding whether a prosecutor's statement falls outside the wide latitude given, we consider "'the context in which the statement was made, rather than analyzing the statement in isolation.'" 313 Kan. at 407.

44

In *State v. Henry*, 273 Kan. 608, 640, 44 P.3d 466 (2002), the court determined a prosecutor's comment to "'think about Mother's Day yesterday, and her mom how she must have felt. Now [the victim] will never have a chance to be a mother, this young professional sharp, security conscious woman . . . .'" The *Henry* court noted, "The prosecutor's reference to the mother's grief and the introduction of the mother's testimony was not relevant to whether the defendant was afflicted by mental disease or defect at the time of the alleged crimes. The prosecutor clearly intended to inflame the passion and prejudice of the jury." 273 Kan. at 641; cf. *State v. Chandler*, 307 Kan. 657, 690, 414 P.3d 713 (2018) (prosecutor stated defendant "'robbed her own children of their father'" and elicited sympathy for the children).

But the prosecutor's reference to Mother's Day here is distinguishable from *Henry*. The prosecutor was painting a scene describing law enforcement's discovery of L.B.'s body that included many details not necessary to the case, such as describing the cool spring evening and use of flashlights. The only reference to Mother's Day was followed by 11 days of testimony and evidence, so its alleged appeal to passion seems overblown. The State never mentioned it again. Nor did it ever imply finding L.B.'s body just before Mother's Day was any worse or more tragic than any other day. The comment was within the wide latitude given to prosecutors in crafting an opening statement and not error.

*Baseball analogy*

Flack's final guilt-phase prosecutorial error challenge is to a Chicago Cubs analogy the prosecutor used in rebuttal closing argument. The prosecutor stated:

> "We've not asked you to ignore anything. What we've asked you to do is look at
> the totality, look at all of it. When you consider the defendant's actions before the crime,

45

during the crime, after the crime. When you consider the defendant's words, his statements about what happened. And then you take that and you consider other witness observations, the physical and scientific evidence, when you look at all of that, all of that leads to one conclusion. It's him. It's no one else. It's simply him. No matter how many times, no matter how many ways, the defendant's version that there were other people involved is simply not supported by evidence.

"You know in terms of possibility, every February I'm a happy man. I'm a happy man because on February 15th it's the start of spring training and as a lifelong Chicago Cubs fan, I am filled with hope because it is possible, it is possible that this could be the Cubs year. But inevitably, inevitably sometimes by June, sometimes late August, it is no longer possible that it's going to be the Cubs year. I'll keep my fingers crossed in terms of the season. I'll keep superstitions and I'll have to go spit in the river now or something. But there's always possibilities, but there comes a point, just like in baseball that at some point in the season it's no longer possible that our team is going to win the pennant or our team is going to go to the World Series.

"There comes a point when it is not possible and it's not possible because it's not supported by hard evidence. And the hard evidence, the circumstantial evidence here, all overwhelmingly points to one person and one person alone."

Flack argues this analogy improperly sought to define reasonable doubt akin to the puzzle analogy disapproved of in *State v. Sherman*, 305 Kan. 88, 115-18, 378 P.3d 1060 (2016). Again, we disagree.

In *Sherman*, the State showed a PowerPoint slide depicting Mount Rushmore with Theodore Roosevelt's face removed. The slide contained the question, "'Do you have a REASONABLE DOUBT this is Mt. Rushmore??'" and, "'Even though you can't see all four figures!!'" 305 Kan. at 96. We disapproved because this analogy "improperly equated a juror's prior knowledge about the picture being displayed to his or her 'life experience.'" 305 Kan. at 116. It inappropriately "foster[ed] the illusion that the jurors

46

already know the full picture of the case they are hearing and are simply looking for pieces of evidence to match it." 305 Kan. at 116. Contrary to that implication, "we insist that jurors have minimal to no prior knowledge of a case precisely to prevent them from seeking evidence to confirm a preconceived narrative and conclusion." 305 Kan. at 116.

Flack argues the baseball analogy just substitutes baseball wins and losses for pieces of a puzzle. He argues the prosecutor was telling the jury it did not need to see the full season play out and could turn off the TV and assume the worst "based on their knowledge of how such things usually go." But one obvious problem with his argument is that the analogy does not attempt to describe reasonable doubt, let alone define it. The prosecution does not mention reasonable doubt until later, when it still does not try to define it.

Based on the context, this permissibly appealed to the jury's common sense to evaluate the weaknesses in Flack's case. See *State v. Butler*, 307 Kan. 831, 867-68, 416 P.3d 116 (2018) (permissible for prosecution to say the defendant's version of events was ridiculous, not believable). The prosecutor specifically mentioned Flack's claim that more people were involved and used baseball to argue the evidence does not support that. He seems to have been saying that at some point, based on how a baseball season works, a team might have so many losses it simply cannot win the season—it is not possible to get to the World Series. By analogy, the prosecutor pointed out there was more than enough contrary evidence to show Flack's version was impossible. We hold this was not error.

We find no prosecutorial error during the trial's guilt phase.

Flack alleges three prosecutorial errors that occurred in the penalty-phase closing arguments. He claims the prosecutor erred by (1) repeatedly asking the jury to consider, "What is justice?" (2) stating facts not in evidence when he implied Flack could access mental health treatment in prison and stated Flack's family would be "healed" regardless of the sentence, and (3) improperly interjecting opinion into the case by suggesting as a "seasoned prosecutor" he knew the death penalty was appropriate here. We hold no error occurred.

*Standard of review*

Our standard of review for prosecutorial error claims in the penalty phase largely remains unchanged from the guilt phase, although, in a capital murder trial, a prosecutor has a "'heightened duty'" to refrain from committing error due to "'the life and death nature of the proceedings.'" *State v. Kleypas*, 305 Kan. 224, 315, 382 P.3d 373 (2016) (*Kleypas II*). If there are multiple prosecutorial errors, the inquiry "'is whether the total effect of the cumulative [errors] found to exist, viewed in light of the record as a whole, had little, if any, likelihood [or any reasonable possibility] of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances.'" 305 Kan. at 315.

*"What is justice?"*

Flack challenges the prosecutor repeatedly asking, "What is justice?" during opening and closing statements. His opening statement began and ended with this theme:

"The penalty phase, it's a narrow band of cases in Kansas that require this litigation. There has been a capital murder conviction. The elected law enforcement official from this county, Mr. [Prosecutor], has decided that twelve well-vetted jurors from the county where the crime occurred should decide this: *What is justice? What is justice?*

. . . .

"The core issue comes down to this: Once the arguments are over, you're in the jury room, deliberations have begun, the foreperson receives the instructions.

"The question will become: Abiding by the instructions that you're given, considering the facts and the circumstances that you have found to exist, each of you will have to ask yourself, *what is appropriate justice?*

"The evidence will show . . . a twenty-one year old mother that before the trigger was pulled, and the contents of a PDX round tore through her brain, the evidence will show that she was stripped from the waist down. The evidence will show that she's unable to hold those who are around her because her hands are tied, bound behind her back.

"The evidence will show that she is unable to verbalize to those who are around her because her mouth is gagged. The evidence will show that she is unable to clearly see what is around her because her glasses have been taken off.

"The evidence will show that all she's left with is this: She can feel, smell, and hear. She can feel the carpet on her face. She can feel the air on her naked legs and buttocks. She is breathing the air in that master bedroom. And she is hearing the footsteps, the footsteps of those around her. The words and the sounds of those around her. *What is appropriate justice? What is appropriate justice?*

"The evidence will show that [K.B.'s] eighteen month old child, [L.B.], standing by her dead mother's body. The evidence will show that the trigger was pulled and the

49

contents of that PDX round tore through her small torso. *What is appropriate justice? What is appropriate justice?*

"Life without the possibility of parole, imposition of the death penalty? It is for you to decide." (Emphases added.)

At the end of the State's pre-rebuttal closing, the prosecutor briefly returned to this theme:

"The core issue in this case, abiding by the instructions given to you, considering the facts and the circumstance that you have found to exist. Each of you will have to ask . . . yourself this: *What is appropriate justice? What is appropriate justice?* A 21 year old mother shot in the back of the head, followed by her 18 month old child shot in the back. You have to make a decision, *what is appropriate justice? What is appropriate justice?* Imposition of the death penalty? Life without the possibility of parole? That decision is for you to make." (Emphases added.)

Flack compares these comments to disapproved prosecutorial appeals to justice and sympathy. See, e.g., *State v. Holt*, 300 Kan. 985, 996-99, 336 P.3d 312 (2014). Flack argues "the prosecutor was clearly asking, 'What is justice *for them*?'" The State counters he takes the comments out of context—the prosecutor correctly set forth the penalty phase procedures, and he never asked the jury to return a death verdict or argued it would be appropriate. Even so, Flack asserts the comments "distracted the jury" from its duty to decide the case on the facts and the law, as given by the judge.

We disagree. In *Holt*, we determined a prosecutor erred by "stating that the jury has the 'privilege . . . to right a wrong,' and '[y]ou and only you can right the wrong that the defendant has committed in taking a young man's life.'" *Holt*, 300 Kan. at 999. The remarks were "akin to asking the jury to administer justice for the victim" rather than "a general appeal for justice." 300 Kan. at 999. And we noted the prosecutor "'divert[ed] the

50

jury from the evidence so as to obtain a conviction based upon sympathy for the victim.'" 300 Kan. at 998.

Our pre-*Holt* caselaw similarly distinguished between a general appeal for justice and an appeal for a jury to do justice *for the criminal victims*, although these cases generally declined to draw a bright line. See, e.g., *State v. Britt*, 295 Kan. 1018, 1030-31, 287 P.3d 905 (2012) (prosecutor's request for the jury to "'do the right thing, here, find him guilty'" was "more aptly characterized as a general appeal for justice that was not explicitly tied to the community or the victim"); *State v. Simmons*, 292 Kan. 406, 419, 254 P.3d 97 (2011) ("[A] prosecutor commits misconduct during closing argument when, in effect, he or she asks the jury to base its deliberations on sympathy for the victim or victim's family or to otherwise argue the impact of a crime on a victim or victim's family."); *State v. Martinez*, 290 Kan. 992, 1015, 236 P.3d 481 (2010) (prosecutor's "comment urging the jury to tell A.G. 'she did the right thing' by reporting the incident" was improper "because it appealed to the jurors' parental instincts and diverted their attention from the evidence and the law"); *State v. Nguyen*, 285 Kan. 418, 425-26, 172 P.3d 1165 (2007) (noting a possible "distinction when the argument is asking for justice for the specific victim" but speculating that "[p]erhaps the touchstone is whether the argument seeks to divert the jury from the evidence" with "sympathy for the victim"; in any event, a prosecutorial request for justice is permissible where "the prosecutor's argument was largely evidence based, notwithstanding an underlying promotion of awareness for the victim" "coupled with the admonition against sympathy and prejudice"); *State v. Ruff*, 252 Kan. 625, 631-36, 847 P.2d 1258 (1993) (prosecutorial exhortation for the jury to "'not allow this conduct to be tolerated in our county'" constituted reversible prosecutorial misconduct).

Likewise, the post-*Holt* cases continue to recognize potential prosecutorial error by improperly eliciting sympathy. See, e.g., *State v. Gallegos*, 313 Kan. 262, 276, 485

P.3d 622 (2021) (prosecutor's statements permissible because they did not appeal to jury's sympathy, did not ask the jury to place itself in the victim's position, and did not ask for justice for the victim); *Chandler*, 307 Kan. at 690 (comment urging for conviction because "'she robbed her own children of their father and his fianc[ée]'" erroneous). But here, the prosecutor was not arguing for a conviction; the jury already returned a guilty verdict. Nor did the prosecutor ever directly ask the jury to return a death sentence or suggest that such a sentence was appropriate.

Indeed, the prosecutor began opening arguments with the facially neutral statement that "twelve well-vetted jurors from the county where the crime occurred should decide this: What is justice?" And the prosecutor concluded his pre-rebuttal closing on a similar open-ended note: "You have to make a decision, what is appropriate justice? What is appropriate justice? Imposition of the death penalty? Life without the possibility of parole? That decision is for you to make." Flack's prosecutor did not ask for justice for the victims—he acceptably told the jurors their job was to determine a just sentence.

*Mental health treatment and family healing*

Flack next argues the prosecutor erred by commenting on facts outside the evidence when he "implied to the jury" Flack would receive mental health treatment and his family "would be 'healed' if he were sentenced to death." Flack asserts no evidence shows that. But these characterizations are not entirely accurate:

> "Over this time you've seen the sadness. Sadness can also be healing, healing. Because there's something about a case like this that when you expose bad things to the light, there's healing. There's healing.

"You know, for the healing for the Flack family, that can occur whether there's the long journey towards execution or the long journey towards natural death. That healing doesn't stop with whatever your decision is. And during that journey hopefully Mr. Flack will get the treatment that he needs to address his mental health issues."

"A prosecutor is prohibited from arguing facts not in evidence, but generally has wide latitude to make arguments based on reasonable inferences from the evidence presented at trial." *State v. Novotny*, 297 Kan. 1174, 1189, 307 P.3d 1278 (2013). Here, Flack advances little argument beyond pointing to the statements themselves and offering conclusions, and he cites just one case, *Chandler*, 307 Kan. 657. But in *Chandler*, a prosecutor committed reversible error when she told the jury a nonexistent protection from abuse order had been filed against the defendant and repeatedly hammered that fabricated fact during her closing. 307 Kan. at 678-84. That case hardly supports Flack.

Flack's characterizations are overstated. First, the prosecutor's mental health comments presented only hope and desire, not fact, when he said, "[*H*]*opefully* Mr. Flack will get the treatment that he needs to address his mental health." (Emphasis added.) He did not tell the jury Flack *would* receive mental health treatment, nor did he even suggest it was likely. And as the State points out, the record supports a reasonable inference that mental health treatment might be available based on testimony Flack previously received it in jail and prison. Second, the prosecutor's statements about Flack's family did not promise healing, just that whatever healing they may experience would happen during "the long journey towards execution or . . . natural death" and that "healing doesn't stop" no matter the jury's decision. At most, this statement tried to convince the jury that sympathy for Flack's family should not weigh heavily in its deliberations.

We hold neither statement was erroneous. The prosecutor did not impermissibly state facts outside of evidence during closing.

53

*Self-reference as "seasoned prosecutor" and suggesting, "If not this case, what case?"*

Finally, Flack claims the prosecutor improperly bolstered himself as a "seasoned prosecutor" and offered his opinion that this case warranted the death penalty. The State counters the prosecutor properly requested jurors determine an appropriate sentence given the facts, instructions, and weight of mitigating and aggravating circumstances. The prosecutor said:

> "I ask you to take [Defense]'s argument into consideration. And I hope after all this that the attorneys in this case have represented our professional best.

> "At the end of it, it comes down to what is justice? What is justice? Taking into account all of the instructions, abiding by those instructions, looking at all the facts and circumstances you found to exist.

> "There is a dead 21 year old mother shot in the back of the head, bound and gagged with her 18 month old daughter in that room. Then there's that 18 month old daughter that is shot in the back. These cases are difficult on everyone. The question is, what is justice for that scenario? For the facts and circumstances that you've seen here, what is justice?

> "The State of Kansas, the death penalty. If not this case, what case?"

Our law is clear: In the context of witness credibility, a prosecutor expressing an opinion is a form of unsworn, unchecked testimony rather than commentary on the evidence. *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000). This tracks Rule 3.4(e) of the Kansas Rules of Professional Conduct: "A lawyer shall not . . . state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil

litigant or the guilt or innocence of an accused." KRPC 3.4(e) (2023 Kan. S. Ct. R. at 394).

Flack mischaracterizes the nature and intent of the prosecutor's words. First, while the prosecutor mentioned his experience as a "seasoned prosecutor," he did so during voir dire and penalty-phase closing. During voir dire, the prosecutor asked one of the panels if anyone was nervous. When three of the six raised their hands, he said, "[A]s you can tell by the color of my hair, I'm a seasoned prosecutor and I've handled capital murder death penalty cases before, also homicide cases, but I still get nervous." This statement's purpose was simply to relax nervous jurors.

Second, the prosecutor used the phrase "seasoned prosecutor" during the penalty-phase closing colloquially to remark on his age, not to tell jurors to trust his judgment over their own. After discussing the weighing process instruction, he said, "So you know, at this point as a prosecutor and as you can see I'm a seasoned prosecutor, been around awhile. I usually . . . zoom back in to the key place." Here, the "key place" was the master bedroom where the bodies were found. But the prosecutor really wanted "to zoom in on the courtroom," calling for the jurors to consider the presented facts and law.

Neither statement related to his separate query, "If not this case, what case?" during penalty-phase closing. The logical leap is too large to conclude combining these unrelated statements told the jury the prosecutor had seen a lot of cases and felt this one was deathworthy. His comments were made far apart and separately. Their combined effect was not error.

That said, it is possible the "if not this case" comment alone is error. As Flack points out, at least two other jurisdictions have held similar comments to be error. The

55

Oklahoma Court of Criminal Appeals disapproved of a problematic prosecutor who had run afoul of the court:

"[T]he prosecutor improperly pleaded with the jury to do justice 'and the only way you can do that is bring back a sentence of death.' He also told the jury *'If this isn't a death penalty case, what is?'* It is error for a prosecutor . . . state his personal opinion as to the appropriateness of the death penalty." (Emphasis added.) *Torres v. State*, 962 P.2d 3, 18 (Okla. Crim. App. 1998).

Although *Torres* does not give more context for the nearly identical statement, the court ultimately ruled the statement along with the prosecutor's other errors were harmless. 962 P.2d at 18.

Flack's second case, stemming from a Missouri habeas corpus petition, required vacating the defendant's death sentence. There, the prosecutor spoke his opinion:

"I've been a prosecutor for ten years and I've never asked a jury for a death penalty, but I can tell you in all candor, I've never seen a man who deserved it more than [the defendant]. By returning your verdict in this case . . . that either means that you believe beyond a reasonable doubt that he pulled the trigger, or that he had the frame of mind that's consistent with pulling the trigger, and I submit to you, that [the defendant] did pull the trigger, and didn't pull it once, but pulled it twice—executed an innocent man in cold blood.

"So, where do we go from there? I say to you that I never saw a man who deserved it more and I say that to you in complete sincerity, and it's my job, as I see it, to tell you that." *Newlon v. Armontrout*, 693 F. Supp. 799, 804 (W.D. Mo. 1988), *aff'd* 885 F.2d 1328 (8th Cir. 1989).

The *Newlon* court held the prosecutor discussing declining to seek the death penalty until this case was improper, especially when the death penalty statutes were unconstitutional for much of that period. *Newlon*, 693 F. Supp. at 804-05. The *Newlon* prosecutor continued that theme but added several more erroneous statements. He emphasized he was the "'top law enforcement officer of the [c]ounty,'" compared the defendant to infamous mass-murderers, personalized analogies to jurors defending their own children, referenced war and courage, insinuated all murder should be punished with death, and reassured jurors appellate review follows any death sentence. 693 F. Supp. at 808. In combination, the jury faced a "relentless, focused, uncorrected argument based on fear, premised on facts not in evidence, and calculated to remove reason and responsibility from the sentencing process." 693 F. Supp. at 808.

By contrast, the prosecutorial remark here, taken in context, permissibly and simply requested jurors to accurately perform their jobs by following their instructions. The prosecutor did not commit error.

HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATING CIRCUMSTANCE

The State charged Flack with capital murder based on the "intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." K.S.A. 2012 Supp. 21-5401(a)(6). The instruction for capital murder required the jury to find Flack "purposefully killed [K.B.] and L.B." The State's notice of intent to seek the death penalty included the aggravator: "The defendant, as to [K.B.], committed *the crime* in an especially heinous, atrocious, or cruel manner" following K.S.A. 2012 Supp. 21-6624(f)'s exact language. (Emphasis added.)

57

Flack argues the heinous manner aggravator is limited to "the crime," while the version of capital murder he was convicted of required multiple killings, so the State had to allege and prove he killed both K.B. and L.B. in a heinous manner. We disagree. The statutory scheme does not require this.

*Standard of review*

To the extent this issue requires statutory interpretation, it presents a question of law subject to unlimited review. If the statutory language is plain and unambiguous, we apply the language as written. *State v. Dinkel*, 314 Kan. 146, 155, 495 P.3d 402 (2021).

*Discussion*

Flack equates the State's notice of intent to seek the death penalty with a charging document. He cites *State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016), to support his claim the State needed to "charge" the heinous aggravator as to both K.B. and L.B. In *Dunn*, we identified "three possible types of charging document insufficiency a criminal defendant may challenge." 304 Kan. at 815. First, a charging document must meet "the Kansas constitutional minimums of correct court and correct territory." 304 Kan. at 815. Second, it must allege "facts about the intent and action on the part of the defendant that, if proved beyond a reasonable doubt, would constitute violation of a Kansas criminal statute." 304 Kan. at 815. Third, it must satisfy "federal and state constitutional standards for due process and notice, such that the defendant has an opportunity to meet and answer the State's evidence and prevent double jeopardy." 304 Kan. at 815. The type of deficiency determines the available remedies for each. 304 Kan. at 816-17.

Flack argues his claim falls within the second and third categories:  The State "failed to state facts that constitute a Kansas crime" and "the defective charge denied

[him] due process." Before discussing *Dunn*, and what it means here, we note the process for pursuing the death penalty differs from charging the underlying crime of capital murder. That distinction is critical to understanding *Dunn*'s limitations.

In setting the second category's framework—charging the underlying crime of capital murder—the *Dunn* court noted K.S.A. 22-3201(b) requires a charging document to "state 'essential facts' constituting the crime charged." 304 Kan. at 811. The statute emphasizes "'facts' rather than 'elements.'" 304 Kan. at 811. "A Kansas charging document should be regarded as sufficient . . . when it has alleged facts that would establish the defendant's commission of a crime recognized in Kansas." 304 Kan. at 811-12.

To determine whether the alleged facts constitute a Kansas crime, we use the crime's statutory definition to determine if the factual allegations, if proved beyond a reasonable doubt, would justify a guilty verdict. 304 Kan. at 812. The State charged Flack under K.S.A. 2012 Supp. 21-5401(a)(6) with the "intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." The capital murder's definition does not include aggravating circumstances. Those are instead set forth in the death sentence procedure statutes, applicable only after the State obtains a conviction for capital murder.

K.S.A. 2022 Supp. 21-6617(a) governs the State's requirements to give a written notice of its intent to seek the death penalty. If the prosecutor fails to give the notice and the defendant is convicted of capital murder, the sentence will be life imprisonment without the possibility of parole, and death penalty cannot be imposed. K.S.A. 2022 Supp. 21-6617(a).

59

But the notice of intent is not the State's only obligation. The State must also provide the defendant notice of all aggravating factor evidence it plans to use. See K.S.A. 2022 Supp. 21-6617(c). Notably, the subsection (c) notice does not need to be provided at the same time as the subsection (a) notice. *Kleypas I*, 272 Kan. at 979. The *Kleypas I* court distinguished between the two notice requirements. The notice of intent allows the defendant to begin their preparation for trial as it serves notice that the case will indeed be a death penalty case, thus allowing them to make choices regarding the retention of counsel, plea bargaining, and preparation of mitigating factors. 272 Kan. at 979-80. On the other hand, the subsection (c) notice permits, but does not require, the State to give notice of aggravating circumstances. See K.S.A. 2022 Supp. 21-6617(c) ("Only such evidence of aggravating circumstances as the state has made known to the defendant prior to the sentencing proceeding shall be admissible."). The State need only give such notice "within a reasonable time prior to trial to allow the defendant an opportunity to prepare to defend against the aggravating circumstances." *Kleypas I*, 272 Kan. at 980.

Flack's claim the State must prove he killed both K.B. and L.B. in a heinous manner does not neatly fit the charging deficiency paradigm under *Dunn*; it more closely resembles an evidence sufficiency claim. The State met both statutory notice requirements about its intent to seek the death penalty and its intended aggravating factor evidence. Neither statutes nor caselaw supports such a claim.

K.S.A. 2022 Supp. 21-6624 sets out the aggravating circumstances available for capital murder:

> "(a) The defendant was previously convicted of a felony in which the defendant inflicted great bodily harm, disfigurement, dismemberment or death on another.

> "(b) The defendant knowingly or purposely killed or created a great risk of death to more than one person.

60

"(c) The defendant committed the crime for the defendant's self or another for the purpose of receiving money or any other thing of monetary value.

"(d) The defendant authorized or employed another person to commit the crime.

"(e) The defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution.

"(f) The defendant committed *the crime in an especially heinous, atrocious or cruel* manner. A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel. Conduct which is heinous, atrocious or cruel may include, but is not limited to:

(1) Prior stalking of or criminal threats to the victim;

(2) preparation or planning, indicating an intention that the killing was meant to be especially heinous, atrocious or cruel;

(3) infliction of mental anguish or physical abuse before the victim's death;

(4) torture of the victim;

(5) continuous acts of violence begun before or continuing after the killing;

(6) desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing; or

(7) any other conduct the trier of fact expressly finds is especially heinous.

61

"(g) The defendant committed the crime while serving a sentence of imprisonment on conviction of a felony.

"(h) The victim was killed while engaging in, or because of the victim's performance or prospective performance of, the victim's duties as a witness in a criminal proceeding."

Flack correctly states the heinous manner aggravator applies to "the crime," not the crime's elements, but his conclusion that each killing in a multiple-killing capital murder must have been committed heinously does not necessarily follow.

As readily seen, the aggravating circumstances apply to various subjects—such as "the defendant," "the crime," and "the victim"—between subsections. Subsection (f) defines the heinous manner aggravator with both "the crime" and "the victim." It provides a nonexhaustive list of circumstances a jury may find heinous including conduct concurrent with the act of killing or conduct not necessarily concurrent with a killing, such as prior stalking and planning or preparation. K.S.A. 2022 Supp. 21-6624(f)(1)-(2). Finally, subsection (f) encompasses a catchall provision of "any other conduct" the jury "expressly finds is especially heinous." K.S.A. 2022 Supp. 21-6624(f)(7).

So, rather than requiring the heinous manner aggravator apply to each killing, the statute instead focuses on whether "the crime" in total was committed in a heinous manner. Nothing in the statute supports Flack's reading. Under our death penalty scheme, any finding of an aggravating circumstance, not outweighed by mitigating circumstances, is sufficient to sentence the defendant to death. K.S.A. 2022 Supp. 21-6617(e). The scheme does not assign weight to the number of aggravating circumstances; the finding of such a circumstance merely triggers the weighing process.

The State alleged the heinous manner circumstance and gave Flack notice about its intended evidence to prove the circumstance specifically related to Flack killing K.B. Imposing a death sentence here did not deprive Flack of due process.

JURY INSTRUCTIONS:  SENTENCING PROCEEDING AND DUTY-TO-REACH-VERDICT

Flack challenges two jury instructions from the penalty phase. He argues the first penalty-phase instruction that informed jurors a guilty verdict would be followed by a separate sentencing proceeding erroneously implied the jury would not be responsible for sentencing. He also contests the verdict form alleging it told jurors they had to reach a unanimous decision to give him a life sentence.

*Standard of review*

We review jury instructions under a three-step framework. First, we determine if the issue was properly preserved below. Second, we consider the claim's merits to decide whether error occurred below. At this step, we consider if the challenged instruction was legally and factually appropriate. We exercise unlimited review of the entire record and view the evidence in the light most favorable to the requesting party. Finally, if there was error, we examine if the error was harmless. *State v. Gleason*, 305 Kan. 794, 800-01, 388 P.3d 101 (2017); *Kleypas II*, 305 Kan. at 305-06.

*Discussion*

The first instruction told the jury that "when a defendant has been found guilty of capital murder, a separate sentencing proceeding *shall* be conducted to determine whether the defendant shall be sentenced to death." (Emphasis added.) At trial, Flack requested to

63

replace "shall" with "may" because it implies "the jury was not ultimately responsible for" sentencing. The court declined, and before us Flack raises the argument again.

There may be a grain of truth to Flack's claim in that a penalty phase is not needed if the State does not seek the death penalty. See K.S.A. 2022 Supp. 21-6617(a) (requiring the State give written notice within seven days of arraignment it intends to seek the death penalty). Otherwise, a person convicted of capital murder receives a life sentence. But his desired language misstates the law because a person can only be sentenced to death if a jury makes the necessary findings. Changing "shall" to "may" could lead the jury to believe the State had another procedural option to obtain a death sentence, and "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger." *Caldwell v. Mississippi*, 472 U.S. 320, 333, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985).

Whether a separate sentencing proceeding happens in every capital case or only after the State decides to pursue that option, the given instruction here fairly stated the law and did not mislead the jury.

Next, at the penalty phase's conclusion, the court instructed the jury on completing the verdict form, explaining, "[I]f one or more jurors are not persuaded beyond a reasonable doubt that aggravating circumstances are not outweighed by mitigating circumstances, then you shall sign the appropriate alternative verdict form indicating the jury is *unable to* reach a unanimous verdict sentencing the defendant to death." (Emphasis added.) The verdict form provided two options:  (1) the standard and necessary findings to impose a death sentence with space to note applicable aggravating factors, and (2) "We, the jury . . . state that we are *unable to* reach a unanimous verdict sentencing the defendant to death." (Emphasis added.) Over Flack's objection the "unable

64

to" language implied jurors must reach a unanimous verdict for or against the death sentence, the court declined to replace "unable" with "did not."

His suggested language advances a novel reading of the death penalty sentencing statutes. K.S.A. 2022 Supp. 21-6617(e) provides:

> "If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances . . . exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; *otherwise, the defendant shall be sentenced to life without the possibility of parole*. The jury, if its verdict is a unanimous recommendation of a sentence of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstances which it found beyond a reasonable doubt. *If, after a reasonable time for deliberation, the jury is unable to reach a verdict, the judge shall dismiss the jury and impose a sentence of life without the possibility of parole*." (Emphases added.)

According to Flack, the third sentence conflicts with the first. He argues, "Sentence one says that the inability to agree is a life verdict; sentence three seems to say the inability to agree is not a verdict at all." But even if Flack's suggested conflict exists, his preferred interpretation does not materially differ from the *Kleypas I* court's understanding of the statute. In *Kleypas I*, the court held a sentencing verdict form stating, "'We, the jury . . . *unanimously* determine that a sentence as provided by law be imposed by the Court,'" misled the jury it must reach a unanimous verdict. *Kleypas I*, 272 Kan. at 1062. K.S.A. 2022 Supp. 21-6617's predecessor "does not require the jury to unanimously conclude that a death sentence is unwarranted in order to sentence the defendant to a punishment other than death; rather, the jury must only fail to unanimously conclude beyond a reasonable doubt that a death sentence is warranted." 272 Kan. at 1062.

Flack correctly notes the jury is not under a duty to reach a unanimous verdict, but he fails to establish the given instruction might lead jurors to believe such a duty existed. The instruction and verdict form accurately state the law and could not have misled the jury. See *State v. Sims*, 308 Kan. 1488, 1505, 431 P.3d 288 (2018) (jury instructions reviewed "together as a whole," not in isolation). The instruction informed the jury the sentence would be life without parole if it could not reach a verdict, and the verdict form provided an option to state it could not reach a unanimous verdict of death. Nothing implied it must reach a unanimous decision to impose a life sentence.

EIGHTH AMENDMENT CHALLENGE

Flack raises a categorical Eighth Amendment challenge to his death sentence, even though he acknowledges we recently addressed and rejected nearly identical claims in *Kleypas II*, 305 Kan. at 328, 337, and *State v. Kahler*, 307 Kan. 374, 406, 409, 410 P.3d 105 (2018). In both cases, counsel compared the mentally ill to intellectually disabled people to establish they are less culpable for their crimes. Flack reiterates those arguments without adding anything materially different from prior cases, so *Kleypas II* controls. We see no reason to revisit its holding.

SECTIONS 1 AND 5 OF THE KANSAS CONSTITUTION BILL OF RIGHTS

Flack challenges the death penalty's constitutionality under section 1 of the Kansas Constitution Bill of Rights. We addressed the same issue in *State v. Carr*, 314 Kan. 615, 625-26, 502 P.3d 546 (2022) (*R. Carr II*), and *State v. Carr*, 314 Kan. 744, 753, 502 P.3d 511 (2022). In those cases, we characterized the argument as contending "section 1 protects the right to life, and Kansas' capital sentencing scheme unconstitutionally

infringes upon this right." *R. Carr II*, 314 Kan. at 627. We rejected that argument, holding:

> "The historical record reflects the framers did not intend the term 'inalienable' in section 1 of the Kansas Constitution Bill of Rights to be construed as 'absolute' and 'nonforfeitable.' Instead, a careful reading of section 1, coupled with the transcripts of the convention debate, demonstrates that the term 'inalienable' refers only to one's ability to transfer his or her right or interest to another person. Though inalienable, the framers viewed the natural rights guaranteed within this section to be forfeitable in civil society. So construed, the framers did not intend for section 1 to impede or limit the State's authority to punish individuals for their criminal conduct." 314 Kan. 615, Syl. ¶ 4.

Additionally, Flack attacked the death penalty under section 5 of the Kansas Constitution Bill of Rights. *R. Carr II* also addressed that issue, as a "constitutional challenge to the practice of 'death qualifying' juries in Kansas—the process of removing prospective jurors for cause . . . when their conscientious objection to capital punishment substantially impairs their ability to fulfill the oath and obligations of a juror." 314 Kan. at 645. We rejected that argument, holding:

> "[B]oth the plain meaning and historical record confirm that a 'jury' is defined as a group comprised of persons who will determine issues of fact and return a decision based on the evidence and in accordance with the law as instructed. Death qualification . . . removes only those prospective jurors who cannot fulfill these obligations due to conscientious objection to the death penalty, i.e., the statute authorizes removal of those prospective jurors excluded from the constitutional definition of a 'jury.' Thus, death qualification facilitates the very jury trial right guaranteed by section 5. Moreover, when the Kansas Constitution was adopted in 1859, the common law did not preclude, and in fact authorized, this procedure. For these reasons, we hold that death qualification under K.S.A. 22-3410 does not violate section 5." 314 Kan. at 653.

67

Flack offers no new authority or argument warranting revisiting of *R. Carr II*.

CUMULATIVE ERROR

Based on our rulings, the cumulative error doctrine has no application. *State v. Sieg*, 315 Kan. 526, 536, 509 P.3d 535 (2022).

CONCLUSION

We affirm Flack's convictions and sentence. No errors warrant reversal of his convictions or sentence. We conclude "the evidence supports the findings that" one or more aggravating circumstances "existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances." See K.S.A. 2022 Supp. 21-6619(c)(2). We also conclude the jury imposed the death sentence without "the influence of passion, prejudice or any other arbitrary factor." See K.S.A. 2022 Supp. 21-6619(c)(1).

\* \* \*

STEGALL, J., concurring: I concur with the majority's decision to affirm Flack's convictions and sentence. I depart, however, from the majority's application of section 1 of the Kansas Constitution Bill of Rights in the death penalty context. In my view, our court continues to be wrong by declaring that criminal defendants have no protections under section 1. See *State v. Carr*, 314 Kan. 744, 782-83, 502 P.3d 511 (2022) (Stegall, J., concurring) ("[T]he majority makes it explicit that a criminal defendant has no section 1 protections at all. Indeed, according to the majority, 'the state's power to punish' is limited only by 'due process' and 'cruel or unusual' provisions which 'do not arise under section 1.'"), *cert. denied* 143 S. Ct. 584 (2023).

68

Instead, I have consistently argued that properly understood, section 1 provides a substantive check on the police power of the state—including the power to kill its own citizens. See *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, 742, 440 P.3d 461 (2019) (Stegall, J., dissenting). To effectuate that check on state police power, I articulated the judicial test—rooted in our history and precedent—courts should apply to any section 1 challenge. 309 Kan. at 767 (Stegall, J., dissenting).

But here, as in *Carr*, "[t]he lower courts have not inquired into the [police power test], the parties have not briefed the issue, and this court has declined to take it up." *Carr*, 314 Kan. at 783 (Stegall, J., concurring). It is true that Flack has at least gestured toward applying the appropriate section 1 police power test I set forth in *Hodes*. But he has not made any substantive argument beyond a few conclusory statements, and the record below is entirely void of any findings that might support his claim. In a future case, I am open to considering the constitutionality of the Kansas death penalty under section 1's limit on state police powers. But doing so would require an actual showing based on something more substantial than Flack has provided to demonstrate that our death penalty is not reasonably related to the furtherance of the common good.

So as before, given "the monumental consequences of the state's exercise of this most final, most irreversible, and most grave use of power—killing a human person—I am left with a profound and unshakable disquiet about our court's blessing upon these procedures." 314 Kan. at 783 (Stegall, J., concurring). And because I cannot "presume our death penalty is not reasonably related to the furtherance or protection of the common good—or that it is otherwise arbitrary, irrational, or discriminatory . . . I am left with no option other than to concur in the judgment." 314 Kan. at 784 (Stegall, J., concurring).

WILSON, J., concurring in part and dissenting in part:  The majority finds ambiguity in Kyle Flack's many attempts to invoke his Fifth Amendment right to silence during his interview with police in the early morning hours of May 8, 2013. I cannot agree. Taken collectively, I would hold Flack's final four statements constitute an unequivocal invocation of his right to silence—an invocation which his interrogators failed to scrupulously honor. Because I view the admission of Flack's post-invocation statements to be prejudicial to his convictions for the murders of Andrew Stout and Steven White, I would reverse those convictions and remand for a new trial. And while I believe the evidence of Flack's guilt for his capital murder charge was robust enough to prevent reversal of that conviction, I cannot conclude that the admission of Flack's statements was harmless as to his sentence of death. Thus, for the reasons below, I respectfully concur in part in the result and dissent in part.

Our test here is ostensibly an objective one:  "whether a reasonable police officer under the circumstances would understand the suspect's statement as an assertion of a *Miranda* right." *State v. Aguirre*, 301 Kan. 950, 957, 349 P.3d 1245 (2015). As the majority notes, despite Flack's failure to frame this issue under the right to silence at trial, we can still consider it under K.S.A. 2022 Supp. 21-6619(b). Slip op. at 14-15. Further, even without testimony on the specifics of Flack's statements, the record before us contains the best evidence available in the form of the interview video. We know the time and place of this interview; we can assess for ourselves Flack's tone and manner, as well as the detectives' varied responses to his at-issue statements.

More importantly, the facts before us also reveal that the investigators' key concern in the interview was "finding [L.B.]," who was still missing then and might—for

70

all they knew then—still have been alive. This concern can be readily divined from interviewers' questions themselves: the first thing Alexander asked Flack was "if he knew where [L.B.] was located."

I mention this not because the officers' subjective understanding of Flack's statements matters to our analysis—it does not—but to provide context for their responses to those statements. To put a finer point on it, their uncertainty over L.B.'s fate quashed all incentive for the detectives to treat *any* statement as an invocation of the right to silence. In other words, the detectives effectively wore blinders of incomprehension when presented with Flack's repeated statements because they wanted to prolong the interview; they *wanted* Flack's statements to be ambiguous.

This is why the detectives' subjective understanding of Flack's invocations is, and must be, irrelevant to whether Flack invoked his right to silence. Anyone can appreciate the detectives' concern for finding L.B. For all they knew at the beginning of the interview, she might still have been alive, and Flack might have been the key to bringing her to safety. But as an appellate court, we must concentrate on the statements Flack made and on whether a reasonable officer would understand that Flack was exercising his constitutional right to stop the inquiry by invoking his right to remain silent. The officers' understandable concern for L.B. does not lessen their responsibility to Flack. But this concern necessarily colors the detectives' responses to Flack's statements, including the alleged invocations here. Thus, we must consider what Flack said—and the circumstances in which he said it—to conclude whether a reasonable officer *would* have understood him to be invoking his right to silence.

*Flack's final four statements, collectively, were clear and unequivocal.*

Flack points to several statements as attempted invocations of his right to silence. I agree with the majority that most of Flack's earlier statements were ambiguous for the reasons discussed in the majority opinion. Slip op. at 16-19. But I cannot agree that Flack's final four "take me to jail" statements—the ones the majority labels as Flack's seventh through tenth—were ambiguous. Slip op. at 19-22. Among other possible interpretations, the majority suggests that, "In context, these comments show Flack believed the questioning about what happened at Stout's house was irrelevant, rather than exercising a constitutional right." Slip op. at 22. It further reads Flack's statements as showing that Flack "simply claimed the detectives had already made up their minds about his involvement in these deaths, including their belief he could help them find the child"—and, thus, Flack was not invoking his right to silence. Slip op. at 22.

But while the cold words of the transcript may lend credence to the majority's position that Flack might have meant any number of things, the way Flack *said* them—along with their repetition—clarifies any ambiguity, in my view. And although an appellate opinion cannot entirely convey the nuanced audiovisual information presented in the videos of Flack's interrogation, that information is at least as important in establishing the context and meaning of Flack's words as the words themselves. To clarify the basis for my dissent, then, a bit of additional description is needed.

As the majority notes, Flack made his final four "take me to jail" comments during a portion of questioning about the identities of his violent, drug-related contacts in Emporia. Slip op. at 19-22. At first, as the detective began to explore Flack's involvement with these contacts, Flack abruptly said, "Take me to jail," and looked down at his lap. The detective asked a question. Flack did not respond, but only said, "Take me to jail." The detective asked another question. Flack again only said, "Take me to jail." This time,

there was silence for several seconds. At this point, I believe Flack's intent to invoke his right to remain silent became clear. Even so, the detectives again asked more questions. After answering a couple of them, Flack again said, "Take me to jail." This time he crossed his arms and put his head down on the table. He clearly wanted to stop the interview.

The worst of Flack's self-incriminating statements followed.

These last four statements of, "Take me to jail," lacked some of the accompanying phrases held elsewhere to render similar statements ambiguous, and their exact repetition in the face of several different questions underscored what was, in my view, a clear intent to cut off the interview. Cf. *People v. Jackson*, 1 Cal. 5th 269, 336-41, 205 Cal. Rptr. 3d 386, 376 P.3d 528 (2016) ("Man just take me to jail man. I don't wanna talk no more," was clear and unambiguous.); *State v. Jang*, 359 N.J. Super. 85, 90, 819 A.2d 9 (App. Div. 2003) (Defendant's statement, "'I don't want to talk anymore. Take me to jail,'" terminated the interview.). Any alternative interpretations of these statements strains credulity, in my view: if Flack meant anything besides "take me to jail," he would have said as much during one of his repetitions of the phrase. That he did not crystalizes the clear and unambiguous meaning of his words and their necessary implication: terminate the interview by taking him to jail. Unlike the majority, I thus believe Flack's statements collectively made his meaning clear. I cannot support the majority's speculation as to Flack's meaning, that is, that he was merely expressing his belief about the irrelevance of the detectives' line of questioning.

The State claims that Flack's earlier, ambiguous responses taint the meaning of his later ones. But we have soundly rejected such arguments in the past, and I would do so again here. Cf. *State v. Walker*, 304 Kan. 441, 456, 372 P.3d 1147 (2016) (earlier ambiguous statements did not undermine the clarity of a later set of statements that

73

"[c]ollectively . . . would have made it clear to reasonable law enforcement officers" that a suspect was invoking his Fifth Amendment right to silence). As I have written, Flack's words—and, perhaps more critically, how he said them—rendered his meaning perfectly clear to a reasonable officer.

The majority also finds ambiguity in two of Flack's responses—"What do you want me to tell you?" and, "I don't know the fuckin' people"—which, the majority, claims, "lead to a reasonable inference Flack meant 'I don't know,' rather than invoking his right to remain silent." Slip op. at 21-22. But the majority's reliance on these statements is flawed. Flack made the first statement between his ninth and tenth attempted invocations, and he made the second one after his tenth and final attempted invocation. Slip op. at 21-22. In my view, Flack had already made his meaning clear, at the very latest, by his ninth overall statement: the penultimate "take me to jail" comment. Statements made after an invocation cannot be used to retroactively "cast doubt on the adequacy" of that invocation, as the majority attempts to do now. E.g., *Smith v. Illinois*, 469 U.S. 91, 98-99, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984). "In other words, if the interrogators simply ignore the suspect's invocation of rights and continue to ask questions, the suspect's compliance with the further questioning does not invalidate or render equivocal the prior invocation of rights." *Aguirre*, 301 Kan. at 958. Thus, I am troubled by the majority's efforts to retroactively interpret Flack's "take me to jail" statements by relying on his later responses.

In evaluating the clarity of an alleged invocation of the right to silence, words matter. Context matters. Magic words are not required. *Emspak v. United States*, 349 U.S. 190, 194, 75 S. Ct. 687, 99 L. Ed. 997 (1955). When we speak of what a "reasonable officer" would have understood, we are referring to an individual of ordinary intelligence possessed of ordinary linguistic comprehension skills. We are *not* speaking of individuals who, for one reason or another, can apply the principles of arcane philosophies and

lexical sophistry to divine ambiguity where, in any ordinary conversation, there would *be* none. A reasonable officer is not one motivated to find ambiguity no matter where or how his goal finds quarter. This latter category naturally includes professional investigators who may be motivated to remain, and thus do remain in the face of all evidence to the contrary, doggedly "uncertain" about a suspect's meaning—particularly those guided by the best of intentions, such as the urgent need to locate a missing child and bring her safely home. See, e.g., Sadeghi, *Hung Up on Semantics:  A Critique of* Davis v. United States, 23 Hastings Const. L.Q. 313, 336 (1995) ("Perhaps the most troubling aspect of the threshold-of-clarity approach is that it leaves the fox guarding the henhouse. The police have little incentive to find that a statement was a clear invocation of rights.").

Yet law enforcement officers, prosecutors, and courts alike have shown over and over their own mastery of speculative mental gymnastics where a suspect *may* be invoking the right to silence or the right to counsel, but not "clearly so." See generally 2 LaFave, Israel, King & Kerr, Criminal Procedure § 6.9(g), n.184-85 (4th ed.) (cataloging many cases finding ambiguity in "even a statement which itself appears to amount to an assertion of the right to remain silent"—including the outright refusal to speak). Nor do courts consider silence *itself*—which a layperson might reasonably view as perhaps the purest indication that a suspect is invoking the right to silence—to be a clear and unambiguous invocation of the right to silence. E.g., *Evans v. Demosthenes*, 902 F. Supp. 1253, 1259-60 (D. Nev. 1995), *aff'd* 98 F.3d 1174 (9th Cir. 1996). Some of these exercises in linguistic contortionism pass beyond the point of parody. See, e.g., *State v. Demesme*, 228 So. 3d 1206, 1206-07 (La. 2017) (Crichton, J., concurring) (finding ambiguity in the phrase "'if y'all, this is how I feel, if y'all think I did it, I know that I didn't do it so why don't you just give me a lawyer dog cause this is not what's up'" because "the defendant's ambiguous and equivocal reference to a 'lawyer dog' does not constitute an invocation of counsel that warrants termination of the interview").

75

Thus, despite the ostensibly objective, non-talismanic standard we purport to apply, "On the whole, courts have set a high threshold for explicit invocation, but it remains unclear what exactly a suspect must say or do to explicitly invoke silence." Rushin, *Rethinking* Miranda*: The Post-Arrest Right to Silence*, 99 Cal. L. Rev. 151, 168 (2011). One is forced to wonder, despite a plethora of caselaw to the contrary, whether magic words *are* required, and even whether the magic words must be followed with actual silence before a suspect clearly and unambiguously invokes the right to silence under the Fifth Amendment. See, e.g., Gee, *Invoking the Right to Counsel and Right to Remain Silent: It's Just Not That Clear*, 32 Miss. C. L. Rev. 69, 81-82 (2013) ("As the erosion of *Miranda* continues with each subsequent Supreme Court term, the limitations placed on both ambiguous requests for counsel under *Davis* and the right to silence under *Berghuis* seem destined to remain in place, or perhaps become even more narrow."). The very meaning of the words "clearly and unambiguously" strains, cracks, and sometimes breaks under the burden we place upon it. This case exemplifies this deterioration.

In other areas of police investigation, courts often give weight—if not total deference—to an officer's deductions, instincts, training, and experience. See, e.g., *State v. Cash*, 313 Kan. 121, 133, 483 P.3d 1047 (2021) ("deference" given to officer's testimony that "in her training and experience a Crown Royal bag 'more often than not' contains drug paraphernalia" for purposes of reasonable suspicion); *State v. Jones*, 300 Kan. 630, 647-48, 333 P.3d 886 (2014) (recognizing "some deference" to an officer's training and experience in assessing reasonable suspicion based on suspicious driving, but still agreeing "with the district judge that the officer acted on a hunch, not reasonable suspicion"); *State v. Moore*, 283 Kan. 344, 359-60, 154 P.3d 1 (2007) (giving "appropriate deference to the opinions of a particular law enforcement officer on the scene who, with thousands of traffic stops, is highly experienced in roadside searches and seizures and determinations of reasonable suspicion" while cautioning against "a total, or substantial, deference to law enforcement's opinion concerning the presence of

reasonable suspicion"); *State v. Wonders*, 263 Kan. 582, 598, 600, 952 P.2d 1351 (1998) (trial court considered officer's training and experience in finding probable cause to believe a bulge in a suspect's pocket was marijuana, but recognizing "that experienced, knowledgeable law enforcement officers know the 'magic words' to be related when their searches and seizures are challenged"). Yet in the arena of the Fifth Amendment, courts constructively infantilize officers by imputing to them a basic lack of language comprehension. Moreover, our legal framework provides little incentive for officers to exercise caution in the face of a *possible* invocation—anything besides a precise recitation of some court-approved legal formula. After all, if a court can divine any ambiguity at all in a suspect's statements, it will reward an officer's constructive "uncertainty" over any language that *does not* contain a precise invocation incantation. In other words, we have created a system under which officers have little reason *not* to gamble by refusing to scrupulously honor an invocation—*unless*, that is, it is expressed through a set of specific legal magic words.

Here, a reasonable detective could not have understood Flack's repeated identical "take me to jail" statements to mean anything besides a request to terminate the interview and "take [him] to jail." The majority's alternative view—that Flack's responses *could* be interpreted as merely bemoaning the futility of the detectives' line of questioning— appears strained to me. "We should not seek ambiguity where none exists" to sanction detectives' continued questioning in the face of an invocation of the right to silence. Cf. *U. S. Fid. & Guar. Co. v. W. Cas. & Sur. Co.*, 195 Kan. 603, 605, 408 P.2d 596 (1965) (refusing to invoke the rule of liberal construction when an insurance policy used unambiguous language). Flack repeated his precise request to be taken to jail over and over; I cannot view such exact repetition as anything other than an attempt to terminate the conversation.

Thus, in my view, Flack did what he needed to do to invoke his right to silence under the Fifth Amendment. An invocation need not be perfect—and Flack's was not—but Flack's meaning should have been clear to his interviewers all the same. The detectives failed to scrupulously honor that invocation, and thus the district court erred in failing to suppress his statements.

This failure also extends to the statements Flack made during the second interview, which the prosecution used to develop its theory of the case. As we have said,

> "Based on *Miranda* and [*Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975)], if a defendant invokes his or her right to remain silent, the interrogation must stop immediately and the right must be scrupulously honored. This does not mean an interrogation resumed at a later time is invalidated if the defendant knowingly and voluntarily waived the right to be silent at this later time and the defendant's right to be silent was scrupulously honored while it was invoked." *State v. Robinson*, 261 Kan. 865, 887-88, 934 P.2d 38 (1997).

In *Aguirre*, the court considered "whether the police could obtain a valid *Miranda* rights waiver at a subsequent interrogation after refusing to honor an invocation of those rights at the first interview." 301 Kan. at 961. The *Aguirre* majority found that the defendant attempted to invoke his *Miranda* rights and cease questioning in an initial interview, but that detectives failed to scrupulously honor that invocation. This, the majority concluded, meant that Aguirre's statements in the first interview should have been suppressed. In considering Aguirre's statements at a followup interview, the majority applied a two-part analysis previously set forth in *State v. Matson*, 260 Kan. 366, 374, 921 P.2d 790 (1996), and *State v. Mattox*, 280 Kan. 473, 481, 124 P.3d 6 (2005):

78

"[T]he validity of a *Miranda* waiver, after a suspect has previously invoked those rights, depends on whether 'the accused (a) initiated further discussions with the police and (b) knowingly and intelligently waived the previously asserted right.' The State failed the *Matson* test by reinitiating the second interrogation. [Citations omitted.]" *Aguirre*, 301 Kan. at 961.

Thus, the court concluded, "Under that circumstance, the police were constrained, if not prohibited, from reinitiating questioning" and "the statements obtained in the second interview should have been suppressed, as well." *Aguirre*, 301 Kan. at 961-62.

Here, detectives did not stop their questioning after Flack's invocation. Instead, they continued to try to convince Flack to "help us find this baby" by zeroing in on the "Mexicans" or "South Side "South Side Lobos" he had mentioned. And while the second interview began about fourteen-and-a-half hours after the first interview ended—an interlude in which Flack was offered three meals and "a place to rest"—and while Flack was given fresh *Miranda* warnings at the outset of the second interview, detectives, not Flack, initiated the second interview. Thus, Flack's statements in the second interview should have also been suppressed.

*Harmlessness—Guilt Phase*

I turn next to the harmlessness of the district court's error.

"When a defendant's constitutional rights have been violated, the State must 'carry the burden of proving "beyond a reasonable doubt that the error complained of . . . did not affect the outcome of the trial in light of the entire record, i.e., proves there is no reasonable possibility that the error affected the verdict."'" *Walker*, 304 Kan. at 457.

79

I begin with the error's effect on the guilt phase of Flack's trial, beginning with his conviction for the killing of White.

*White's Killing*

During his second interview, Flack admitted that he and Stout killed White together, each of them shooting White once with a shotgun. Flack further admitted to covering White's body with a tarp and leaving it in the outbuilding for more than a week. As the prosecutor emphasized during closing arguments, evidence suggested that White died from two gunshot wounds, each caused by PDX Home Defender shotgun rounds. In his pre-"invocation" statements, Flack admitted purchasing Defender rounds for his shotgun.

The shotgun that was partially recovered from the Emporia recycling center—which contained a mixed DNA profile from at least three people, of whom Flack could not be excluded as the major contributor—fired at least one of the shell casings found in the outbuilding where White was killed. Evidence also suggested that this same weapon fired the five shell casings recovered from the residence's master bedroom, where the bodies of Stout and K.B. were found and where (based on bloodstains) evidence suggested L.B. was shot. The weapon was a 12-gauge "pump action" shotgun that required a discrete action to eject a spent round and chamber a new round before each individual shot could be fired. Evidence suggested that Flack owned a 12-gauge pump action shotgun that he kept at Stout's property, of which he was "proud." One witness noted that Flack "had [the shotgun] with him everywhere he went" and that he had even slept next to it at times. In his pre-"invocation" statements, Flack admitted that he owned a "Remington 1300."

In closing arguments, the prosecutor noted the lack of forensic evidence of a struggle surrounding White's death and highlighted evidence suggesting White was shot in the outbuilding. The prosecutor also emphasized Flack's own statement:

> "And consider finally the defendant's own description of that particular incident. I shot him, he dies. He indicated to law enforcement, I shot him and at the time I shot him, he claims Andrew Stout shot him first, but he indicates that I shot him, he was still alive when I shot him and he dies. Those are the defendant's own words."

But while the evidence suggests that White was killed in the outbuilding on Stout's property, possibly with the shotgun partially recovered from the Emporia dump, major uncertainties exist surrounding the timing and circumstances of White's killing. White was last seen alive on April 20, 2013. As Flack points out, jurors heard testimony that several individuals were at the residence around this time, including Joseph Berger, brothers Andrew and Rocky Helm, Dylan Phillips, Stout, and Flack, among others. Some of these guests fired weapons at Stout's property—a "good shooting spot." Jurors also heard testimony that White and Stout "butted heads often."

The State highlights evidence that Flack "discouraged" his friends from contacting the authorities about White's disappearance. The State highlights circumstantial evidence suggesting that Flack killed Stout, L.B., and K.B., which further implies that Flack also killed White; as the State puts it, Flack "was the only person of that group to walk away from the residence alive." But while this may be a reasonable extrapolation, it does not establish *no* reasonable possibility that Flack's confession *to killing White* affected the jury's verdict. In particular, the killing of White stands apart in both time and place from the killings of Stout, K.B., and L.B., who were all killed several days after White and inside the residence, rather than the outbuilding. In my view, the forensic evidence suggesting Flack's guilt is not overwhelming enough to overcome the prejudicial effect of

81

his direct confession to White's murder. Thus, I would reverse his conviction for White's murder and remand for a new trial.

*Stout's Killing*

Stout was shot four times with a shotgun, including once in the back. Shell casing evidence suggested that the shotgun that was partially recovered from an Emporia recycling center was used in the killing of White, Stout, K.B., and L.B. While Stout was found in the same bedroom as K.B.'s body (where L.B. was also likely shot), the evidence suggests he was killed at least a few days before them—between April 28 and 30, 2013, rather than between May 1 and May 5.

Surveillance camera evidence established that Flack accompanied Stout on a trip to Ottawa on April 28. On that trip, Stout wore the same shirt in which he ultimately died. Circumstantial evidence suggests that Flack further accompanied Stout to Emporia, although the surveillance camera evidence is less clear on this point. Yet this evidence still does not directly place Flack at Stout's residence at the time of Stout's killing, although it may suggest that he was still with Stout at that time. Additionally, Flack's fingerprints were present on items in the bedroom where Stout and K.B. were found. Evidence also placed Flack at Stout's residence around and after the time Stout was likely killed, and Flack made false statements to others concerning Stout's whereabouts after Stout's death. For instance, when Phillips stopped by on April 29, he met only Flack, who told him that Stout was running errands before work.

Unlike White's killing, little evidence supported the presence of other individuals at the residence—other than Flack—during the timeframe of Stout's killing. Flack's brief admits that evidence existed to establish Flack's presence at the house after Stout's death, that Flack made false statements about seeing Stout after he would have been dead, and

that Flack "disposed of the shotgun used to shoot Mr. Stout." But Flack points out that—other than his statements—there is no evidence he was present at the precise *time* of Stout's death, much less that he was the shooter. While that much could be inferred from his later actions—not the least of which was remaining at the house afterward—any such inferences cannot overcome the prejudicial impact of the admission of his statements, including his admission that he was present at the time of Stout's death. Additionally, while circumstantial evidence could support the inference that Flack was using Stout's phone after his death, that inference could not then support a new inference that, therefore, Flack was Stout's killer. Cf. *State v. Colson*, 312 Kan. 739, 750, 480 P.3d 167 (2021) (inference stacking is prohibited). Moreover, any error resulting from the admission of Flack's statements vis-à-vis the killing of White—to which he admitted—would also infect the jury's (otherwise justifiable) inference that Flack was, in fact, Stout's killer. That the jury ultimately convicted Flack of second-degree murder for Stout's death further suggests some uncertainty about the circumstances of this killing, though I do not propose to read the tea leaves of the jury's verdict.

Consequently, while the circumstantial evidence supported Flack's conviction for Stout's murder, it is not overwhelming enough to rule out all reasonable possibility that the erroneous admission of Flack's statements affected the jury's verdict. Thus, I would also reverse Flack's conviction for Stout's murder and remand for a new trial.

*The Killing of L.B. and K.B.*

In closing, the prosecutor focused heavily on forensic evidence to establish that L.B. and K.B. were killed close in time to one another. But the prosecutor asked jurors to "consider his words to law enforcement":

83

"He was correctly able to inform law enforcement what the order of death was. Steven White first, Andrew Stout second, [K.B.] third, [L.B.] last. There's only one way that you know that. There's only one way. You were there and you did it.

"He correctly knew the location of the bodies. He knew that Steven White was in the outbuilding. He knew that Andrew Stout was in the corner. He knew that [K.B.] was buried near the bed. Now he claims he didn't know where [L.B.] was, but he did indicate that she was in a suitcase and that she was wrapped in a blanket. He also correctly described the [s]tate of [K.B.]'s body, her clothing or lack thereof.

"Now in the defendant's statements to law enforcement there were at least eight versions and there are significant inconsistencies between each of the versions. It's for you to judge and determine and assess the credibility of all those different versions and what inconsistencies there are.

"But the inconsistencies all have something in common. They are designed to take the focus and responsibility off of the defendant. It's always, you know, Andrew shot Steven White. Oh, Omar and Chewie, they're the ones that shot Andrew Stout and [K.B.] and [L.B.]. I was just there. He puts himself there during the murders but he's always got a little bit less of a responsibility. Yet he has all these details and there's all this evidence that all points to one person and one person alone, the defendant."

In my view, the circumstantial evidence here appears strong enough to eliminate any reasonable possibility that the prosecutor's insinuation that Flack had "all these details" affected the jury's verdict. Unlike the killing of White and Stout, the evidence surrounding the deaths of L.B. and K.B. effectively rules out any lesser degrees of homicide beyond premeditated first-degree murder. K.B. was gagged, naked from the waist down, and had her hands bound behind her back with zip ties at the time of her death. She was shot in the back of the neck by a shotgun while prone or kneeling on the ground. Her body was later turned face up and she was covered with a pile of clothes. After the clothes were placed atop K.B.'s body, 18-month-old L.B. was shot in the back

with a shotgun while facing the direction of her mother's body. Forensic evidence about the contents of K.B.'s and L.B.'s stomachs further suggests that both were killed on the afternoon of May 1, 2013.

Moreover, the circumstantial evidence supporting a finding that Flack was directly involved in the killing of L.B. and K.B. is stronger than that supporting his convictions for the killing of White and Stout. For instance, cell phone data suggested that Flack was likely present at the residence on May 1 and May 2, 2013. On May 3, 2013, cell phone data suggested that Flack began the day at the residence, then moved within a mile-and-a-half from the place where L.B.'s body was found, and then traveled to Emporia, where his phone remained. Flack subsequently got a new phone.

A little after 5 p.m. on May 7, 2013, cameras captured images of an individual driving K.B.'s car to an apartment parking lot near 12th and East streets in Emporia. The driver got out and threw away a bag from the car into a nearby dumpster. The bag contained items belonging to K.B. and L.B., including L.B.'s baby blanket. Douglas picked Flack up from the parking lot of Do-B's restaurant sometime after 5 p.m. on the evening of May 7, 2013; this parking lot would have been very close to the parking lot where K.B.'s car was left. Circumstantial evidence thus suggested that Flack was driving K.B.'s car and was attempting to dispose of her and L.B.'s property.

Like White and Stout, L.B. and K.B. were killed with a shotgun. Beyond the evidence that the shotgun recovered from the Emporia recycling center—which was Flack's—fired several casings recovered from the residence, one of the shot shells fired from the shotgun was found on K.B.'s leg. Finally, perhaps the strongest circumstantial evidence of Flack's involvement in the killings can be found from the black zip ties in Flack's bag, which were much like the ones used to bind K.B.

85

Admittedly, the DNA evidence collected from K.B.'s body did not strongly implicate Flack. For instance, the major DNA profile taken from the knot of the bandana used to gag K.B. fit K.B.'s DNA, but Flack could not be excluded as the source of the minor profile contribution—although that minor profile would be consistent with the DNA of one in eight individuals. This evidence further suggested that Flack had touched and, perhaps, even tied the bandana used to gag K.B. Further, although Flack could not be excluded as a contributor to samples containing mixed DNA profiles obtained from K.B.'s left hand fingernail clippings, this match was also weak—about a 1-in-28 chance. Moreover, Flack could be excluded as a contributor to DNA samples collected from under K.B.'s right hand fingernail clippings. No conclusion could be reached as to whether Flack contributed to male DNA recovered from K.B.'s pubic hair.

Despite the somewhat lukewarm DNA evidence, I believe the remaining circumstantial evidence of Flack's guilt is overwhelming enough to render the erroneous admission of his statements harmless as to his conviction for killing L.B. and K.B. These killings occurred close together in time and space and could, realistically, only have resulted from intentional and premeditated conduct. Thus, I concur in the result of the majority's decision to affirm Flack's capital murder conviction.

*Harmlessness—Penalty Phase*

I turn next to the harmlessness of the error in the penalty phase of Flack's trial. Flack argues that his statements amplified the State's description of K.B.'s last moments, eliminated "residual" doubt, and made him appear unsympathetic and remorseless before the jury.

But even if Flack's statements did not affect the jury's finding about the *existence* of aggravating circumstances, I find it probable that they affected the jury's *weighing* of

aggravating and mitigating circumstances. The jury watched Flack give the detectives several versions of events, as the prosecution repeatedly highlighted. This could have led the jury to conclude that Flack *was* a remorseless killer who deserved to die for his crimes.

Because I find it probable that Flack's statements impacted at least some of the individual jurors' assessment of the mitigating circumstances, I would vacate Flack's verdict of death and remand for a new sentencing phase of the trial.

*Conclusion*

A "right" to silence which cannot be exercised in practice—even by *actual silence*—is no right at all. Because the majority's analysis undermines the exercise of the constitutional right to silence by implicitly penalizing Flack for failing to utter the proper incantation—despite his repeated, clear requests that the detectives take him to jail, which would necessarily terminate the interview—I respectfully dissent. All the same, I concur in affirming Flack's conviction for capital murder, as I believe the evidence of his guilt to be overwhelming enough to neutralize the prejudicial effect of the erroneous admission of Flack's statements. Likewise, I concur with the majority's analysis about Flack's remaining claims of error.